**STATE of Missouri ex rel. Willetta S. ATKINSON, Relator,**

v.

**PLANNED INDUSTRIAL EXPANSION AUTHORITY OF ST. LOUIS, Missouri, et al., Respondents.**

No. 58660.

Supreme Court of Missouri, En Banc.

Jan. 7, 1975.

William Costello, St. Louis, for relator.

Richard A. Hetlage and Douglas L. Kelly, Peper, Martin, Jensen, Maichel & Hetlage, Kenneth R. Langsdorf, Gen. Counsel, Planned Industrial Expansion Authority, St. Louis, for respondent Planned Industrial Expansion Authority of St. Louis, Mo.

Jack L. Koehr, City Counselor, Joseph R. Niemann, Asst. City Counselor, St. Louis, for respondent City of St. Louis, a Municipal Corp.

Aaron A. Wilson, City Atty., Richard N. Ward, Asst. City Atty., Kansas City, for intervenor-respondent.

## PETITION FOR WRIT IN THE NATURE OF QUO WARRANTO

SEILER, Judge.

Original action in the nature of quo warranto filed in this court pursuant to Art. V., Sec. 4, Mo.Const.1945, V.A.M.S. Relator maintains the Planned Industrial Expansion Law, enacted in 1967, under which the respondent Planned Industrial Expansion Authority of St. Louis is claiming to exist and act, is unconstitutional in numerous respects, and hence said authority should be ousted from asserted rights, privileges and franchises it cannot constitutionally exercise. The city of St. Louis is a co-respondent and Kansas City, which also would like to make use of the law, has been permitted to intervene as a respondent. The facts as stipulated are as follows:

Willetta S. Atkinson, relator herein, is an individual whose property is subject to the purported power and authority of respondent authority. The authority is a public body corporate and politic purportedly created by the Planned Industrial Expansion Law, Secs. 100.310 to 100.620, RSMo 1969, V.A.M.S., and purportedly authorized to execute its powers, duties and functions by Ordinance No. 54788 of the city of St. Louis, passed and approved on December 11, 1967.

The authority and the city have taken steps required by the act to approve "the Manchester-Chouteau Industrial Development Plan" which contemplates the industrial reconstruction and redevelopment of some 40 acres of vacant and improved property. The plan includes the authority and intention to exercise the power of eminent domain granted by Sec. 100.420 of the act to acquire property within the project area in order to fulfill the plan's objectives.

The authority has been in contact with and has received letters of interest in becoming lessees of industrial facilities from several industries concerning facilities to be constructed within the Manchester-Chouteau area, and proposes to issue revenue bonds pursuant to Sec. 100.430 of the act. The property owned by relator lies within this area and is among the properties set forth in the plan which the authority expects to acquire by eminent domain.

The authority and the city have also taken steps required by the act to approve the "Hereford Street Industrial Development Plan" involving approximately 7¼ acres. The ordinance adopted by the city approving the Hereford Street plan also granted tax benefits of Chapter 353, RSMo 1969, as authorized by Sec. 100.570 of the act, to any urban development corporation acquiring property within the project area, and was approved by a vote of more than three-fourths of the governing body of the city. The authority and the city have also taken steps to approve and accept a development project within this area for construction of a 130,000 square foot industrial facility for lease to Paramount Liquor Company; the authority has prepared a lease agreement and a mortgage and indenture of trust for the Paramount Liquor Company project in connection therewith. The authority intends to issue two million dollars of revenue bonds to acquire land and construct facilities for the project, and the authority and the company intend to enter into the above mentioned agreements, which cover the revenue bonds and the project.

Pursuant to actions taken by the authority it has accepted property donated by the ABEX Corporation and has entered a contract to sell said property to the Browning Ferris Company. The authority has begun action to have other areas in the city of St. Louis declared eligible for development by the city and by the authority.

An outline of the Planned Industrial Expansion Law and its provisions is in order. Each city in Missouri with a population of 400,000 or more is authorized by the act to activate, by resolution or ordinance, an

"authority", consisting of twenty-five commissioners, which is to prepare and submit industrial redevelopment plans to the governing body of the city. These plans or projects must be consistent with the general plans for the development of the city as a whole; the governing body of the city must find, by resolution or ordinance, that blighted, insanitary and undeveloped industrial areas exist in the community, the development of which is necessary in the interest of the public safety, welfare, health or morals. Upon approval of a project by the city, an authority is given the power to acquire land in the project area by eminent domain or by other conveyance, to issue bonds, to provide reasonable assistance for the relocation of families displaced by a project, to contract for all services needed in connection with clearance in the project area, to sell, lease or otherwise convey the property it has acquired to developers for industrial or related purposes in accordance with the plan after public notice and the invitation of bids, to make necessary conveyances or contracts with the city for streets, sewers or other public facilities, and to exercise all powers or combinations of powers necessary, convenient or appropriate to carry out its projects. The city and other public bodies are authorized to assist these projects by investing in or granting funds to an authority, by dedicating streets and other necessary public facilities to the project in accordance with the plan, by furnishing administrative or other services, by transferring interests in property to an authority, and by zoning or rezoning in accordance with the plan. Other provisions of the act provide that the income from the bonds issued by an authority shall be exempt from income taxation, and that upon three-fourths approval by the governing body of the city, certain ad valorem tax relief may be granted to urban development corporations involved in the development of the project areas. The act is to be liberally construed to effectuate its purposes.

Similar urban development legislation in Missouri has withstood constitutional challenge. Chapter 353, RSMo 1969, channels private enterprise into public improvement acitivites by providing for the creation of private "urban redevelopment corporations." These corporations are closely supervised by the governing body of the city to insure that their projects are in the public interest. They are subject to a limitation on their profits, but are granted a limited power of eminent domain and certain ad valorem tax benefits on the property which they improve. The provisions of Chapter 353 were upheld as constitutional in Annbar Associates v. West Side Redevelopment Corporation, 397 S.W.2d 635 (Mo.banc 1965), appeal dismissed, 385 U.S. 5, 87 S.Ct. 41, 17 L.Ed.2d 4 (1966).

Other urban development legislation is found in Chapter 99, RSMo 1969 (Secs. 99.300 to 99.660), which provides for the creation of "land clearance for redevelopment authorities." These authorities are public bodies empowered to make plans for and execute the clearance of blighted and insanitary areas and their subsequent redevelopment through "land clearance projects" and "urban renewal projects." An authority under this act is given the power to issue bonds to finance its projects, to acquire property by eminent domain, to clear such property and transfer it to private enterprises for redevelopment in accordance with the project plans. Again, these activities are closely monitored by appropriate governing bodies, which insure that a public purpose is achieved. We have upheld the constitutionality of this act in State on inf. Dalton v. Land Clearance for Redevelopment Authority, 364 Mo. 974, 270 S.W.2d 44 (1954) and Land Clearance for Redevelopment Authority v. City of St. Louis, 270 S.W.2d 58 (Mo.banc 1954).

We have also held that an "urban redevelopment corporation", as defined in Chapter 353, is entitled to the ad valorem tax benefits prescribed by that chapter when it acquires property for redevelop-

ment from a "land clearance and redevelopment authority" pursuant to Chapter 99, Land Clearance for Redevelopment Authority v. City of St. Louis, supra, at 64–65.

The present legislation, the Planned Industrial Expansion Law, is similar to the Land Clearance for Redevelopment Law, Chapter 99. The only significant difference lies in the former's emphasis on the elimination of blighted *industrial* areas and subsequent *industrial* redevelopment. We reach the questions presented by this difference later in this opinion with the realization that St. Louis and Kansas City (the only two cities in Missouri which at present fall within the classification of cities of 400,000 or more inhabitants to which the act is limited) are not islands and that no one who resides in a city of that size is immune from the contagion of urban blight and deterioration.

Relator first contends that the act violates Art. III, Sec. 23, 1945 Mo. Const. in that it contains more than one subject. Relator asserts that Secs. 100.530 to 100.-550 inclusive, which grant powers to public bodies to sell or grant land, to lend or contribute money, or to invest in the obligations of an authority, are entirely separate and distinct from the functions and powers of an authority and constitute a separate subject. Relator specifically attacks Sec. 100.500 of the act which authorizes public bodies to invest in the obligations issued by any "commission, or agency or any other public body in the United States for industrial purposes." Relator contends that these provisions are unconnected with the creation and existence of a Planned Industrial Expansion Authority and are in no way related to or included in the subject of the act.

The controlling test under Art. III, Sec. 23 is whether or not all the provisions of the statute fairly relate to the same subject, have a natural connection therewith or are the incidents or the means to accomplish its purpose. State ex inf. Barrett ex rel. Bradshaw v. Hedrick, 294

Mo. 21, 241 S.W. 402 (banc 1922); Thomas v. Buchanan County, 330 Mo. 627, 51 S.W.2d 95 (banc 1932). The sections of the act in question grant to the city, the state and other public bodies certain powers to aid the financing, planning and execution of an authority's development projects, and we find all these provisions related to the purpose of the act, which is to eliminate blighted, insanitary and undeveloped industrial areas in our large urban communities. Sec. 100.530, for example, empowers appropriate public bodies to dedicate streets and sewers in compliance with a development plan or project; obviously without such aid a project could not be executed. An authority under the act does not and cannot exist in a vacuum; it is a creature of the state and the city which create it, and the manner in which an authority and the concerned public bodies interact relates to the subject matter of the act in a reasonable and natural way. Sec. 100.500, authorizing certain private and public parties to invest in the obligations of any public body in the United States for industrial purposes, is also reasonably related to the purposes and subject of the act; as intervenor-respondent, City of Kansas City, points out, " . . . The provisions of Sec. 100.500 are necessary for creating a market for industrial bonds. Exclusion of the questioned power would make the Act, in effect, an export prohibition. The lack of reciprocity would induce retaliatory measures by other states and would restrict the market in industrial bonds so severely that there would be, in effect, no market at all. The Legislature obviously foresaw the consequences of such an exclusion and included the power to purchase bonds and other obligations other than those issued by an authority created pursuant to the Planned Industrial Expansion Law . . . ." We therefore find that the provisions in the act attacked by relator are naturally connected and reasonably related to each other; to hold otherwise would result in " . . . many separate acts relating to the same general subject, and thus produce an evil quite as

great as the mischief intended to be remedied . . . ." State v. Ward, 328 Mo. 658, 40 S.W.2d 1074, 1076 (1931).

Relator next contends that the subject of the act is not clearly expressed in its title, also in contravention of Art. III, Sec. 23, because the title does not refer to the powers granted to cities and other public bodies in connection with the activities of an authority. We have stated, however, that the title to a statute ". . . needs only to indicate the general contents of the act, and if the contents fairly relate to and have a natural connection with the subject expressed in the title they are within the purview of the title . . ." State v. Weindorf, 361 S.W.2d 806, 809 (Mo.1962). We have indicated above that the provisions of the act are reasonably related. The title to the act provides, inter alia, for the "industrial development of blighted, insanitary or undeveloped industrial areas", and relator cannot really be misled or surprised that the act contains provisions relating to the financing of such a goal, or to the powers of the cities and other public bodies related thereto without which planned industrial development cannot occur.

The act is next challenged as violative of Art. III, Sec. 40, 1945 Mo.Const. in that it is a local and special law applicable only to the cities of St. Louis and Kansas City, and that its limitation to such cities is arbitrary and unreasonable. As to the first point, we cannot say that the act is a special law; the language of the act is general, and it applies to "all cities of this state now having or which hereafter have 400,000 inhabitants or more." Relator asserts that for all practical purposes, no other cities in this state besides St. Louis and Kansas City now achieve or could possibly achieve such a population for many years. However, as we pointed out in Walters v. City of St. Louis, 364 Mo. 56, 259 S.W.2d 377 (banc 1953), aff'd 347 U.S. 231, 74 S.Ct. 505, 98 L.Ed. 660 (1954), where an act applies to all cities of a certain population whether there be one or many, it does not offend against the rule, since it does not exclude any city that *may* come within the classification therein made during its effective existence, despite the improbability that such will in fact occur.

Relator argues further that classification by population for purposes of the act is arbitrary and unreasonable, that the legislature has made no determination or finding that cities of under 400,000 do not have the kind of problems the act seeks to cure. But as we stated in State ex rel. Fire Dist. of Lemay v. Smith, 353 Mo. 807, 184 S.W.2d 593 (banc 1945), a case which upheld the classification of cities between 200,000 and 400,000 for the purpose of incorporation of fire districts, ". . . The question of classification is a practical one. A law may be directed to that class which is deemed to have the greater need for it. There may be omissions from the application of the law; the entire possible field does not have to be covered . . ." 184 S.W.2d at 596. We do not agree with relator that the fact that cities of less than 400,000 may also have blighted, insanitary and undeveloped areas means the act is unconstitutionally under-inclusive.

There are many differences in kind and degree which justify the legislative classification: cities of 400,000 in Missouri are not freestanding communities; they are, for the most part, boxed in by suburban incorporation, with little or no room for expansion. Decentralization takes place as a result of developments in transportation and communication, leading to a decline of the central city, particularly in the downtown areas. Changes in production and merchandising methods call for spacious, single-story plants and stores, which are difficult and expensive to construct in built-up central city areas, but easy to build in large, vacant outlying areas. Jobs locate in suburban municipalities, which then capture the tax revenues which are generated by the jobs. With the movement of jobs comes the movement of workers. Less urban services are required for an af-

fluent, middle class population than for the high-cost, poor, aged and unemployed population left behind in the central cities. With decreasing tax revenues the larger cities are hardpressed to meet the higher urban service requirements of their populations. The budgetary process becomes one of deferred capital improvement, one of juggling priorities to meet emergency items and making cutbacks in services. We observe, too, that over the ten years from 1960 to 1970, St. Louis lost population, Kansas City gained only slightly, while Independence and Springfield, although much smaller in overall size, experienced sizeable growths. The legislature could well have concluded that cities the size of St. Louis and Kansas City had more need for the provisions of the Planned Industrial Expansion Law than did cities the size of Independence and Springfield.

In the interest of brevity, we will now take up several of relator's points out of order, all of which relate to the question of whether the act inures to the benefit of the public and expresses a public purpose. Our holding, for reasons expressed below, that there is indeed a public purpose expressed in the act disposes of relator's challenges to certain tax exemption,[1] eminent domain[2] and financing aspects[3] of the act.

The Planned Industrial Expansion Law is entitled "An Act . . . providing for the industrial development of blighted, insanitary and undeveloped industrial areas . . .", Laws 1967, p. 172. That this

avowed purpose of the Act is a public purpose was well stated in Annbar Associates v. West Side Redevelopment Corp., 397 S. W.2d 635 (Mo. banc 1965), appeal dismissed, 385 U.S. 5, 87 S.Ct. 41, 17 L.Ed.2d 1 (1966):

"It is common knowledge that one of the results of the nineteenth century beginning of the transformation of our country from a predominantly agricultural to a predominantly industrial society has been the growth like 'Topsy' of our great cities. Within the last thirty years we have awakened to the realization that a result of that growth has been the creation of slums and blighted areas therein constituting a serious and growing menace injurious to the public health, safety, morals and welfare of their inhabitants as well as the depreciation in value of properties within and adjacent to those areas, and a consequent progressive diminution of tax revenues. Prompted by the need to eliminate these conditions as a breeding ground for juvenile delinquency, infant mortality, crime and disease, most, if not all, states have vested their municipalities with power to eradicate those conditions and redevelop those areas . . ." 397 S.W.2d at 639.

██ Prior to the exercise of any powers by an authority, the governing body of the city, by resolution or ordinance, must find: (a) that one or more blighted, insanitary or undeveloped industrial areas exist in such community; and (b) that the development of such area or areas is neces-

1. Relator contends that Sec. 100.450(2) (making income from bonds issued by an authority exempt from income tax) and Sec. 100.570 (making available upon three fourths vote of the governing body, certain property tax exemptions to urban redevelopment corporations upon lands and improvements within a project area) violate Art. VI, Secs. 23 and 25, 1945 Mo.Const., in that these tax exemptions constitute a grant of public money to private persons for private purposes.

2. Relator contends that Sec. 100.420 (authorizing an authority to exercise the power of eminent domain to acquire property deemed necessary for its projects) violates Art. I,

Sec. 28, and Art. III, Sec. 38(a) and Sec. 39(1), 1945 Mo.Const., and the Fourteenth Amendment to the United States Constitution in that the exercise of this power under the act is not for a public purpose.

3. Relator contends that Secs. 100.390(6), 100.530 and 100.550 (granting an authority the power to borrow, and governmental units the power to lend or grant funds and incur indebtedness to help finance the authority's projects) violate Art. VI, Secs. 23 and 25, and Art. III, Secs. 38(a) and 39(1), 1945 Mo.Const., in that they permit a granting or lending of credit and a grant of public money to private persons for private purposes.

sary in the interest of public health, safety, morals or welfare of the residents of such city, Sec. 100.320. Thus, development is limited to those areas in which it is necessary for the public purposes stated, and cannot proceed without such a finding. Relator argues that the benefits derived by the clearance and redevelopment of these blighted and insanitary areas are indirect only, and are far outweighed by the massive direct benefits (e. g., tax exemptions, easier financing, etc.) given to the private parties to whom the land is sold or leased for development. However, relator is erroneously presenting the question of public purpose as one of degree. The law does not require us to determine whether the public or private citizens benefit "more" by reason of the legislation. Rather, the rule is that if the primary purpose of the act is public, the fact that special benefits may accrue to some private persons does not deprive the government action of its public character, such benefits being incidental to the primary public purpose. State ex inf. Dalton v. Land Clearance for Redevelopment Authority, supra; Land Clearance for Redevelopment Authority v. City of St. Louis, supra. In Annbar Associates, supra, we affirmed the public purpose expressed by Chapter 353, RSMo 1969, commonly referred to as the Urban Redevelopment Corporations Law, which allows private enterprises to initiate redevelopment projects which, if approved by the city as necessary for the public good, entitle such corporations to acquire land by eminent domain, to be exempt from ad valorem taxation in a prescribed manner, and to obtain financial assistance from government bodies by way of investments and loans. Thus the benefits conferred upon private enterprises under Chapter 353 are much the same as those conferred under the Planned Industrial Expansion Law. These benefits were held to be incidental to the primary public purpose of the act. Relator makes no attempt to distinguish this case from Annbar Associates, and gives us no reason why its principles should not apply here.

We find, then, that the act expresses a primary public purpose, and the relator's contentions that the tax exemptions and the lending of governmental credit or granting of monies are unconstitutional are ruled against him. The same must be said of relator's contention that the eminent domain powers granted by the act authorize the taking of private property for private use in violation of Art. I, Sec. 28, 1945 Mo.Const. Relator ignores Art. VI, Sec. 21, 1945 Mo.Const. which expressly authorizes the taking of private property by eminent domain for the purpose of "clearance, replanning, reconstruction, redevelopment and rehabilitation of blighted, substandard or insanitary areas." Without repeating the reasoning contained therein, we state the conclusion reached by the court in Annbar Associates, supra, 397 S.W.2d at 646, reconciling these two constitutional provisions: "We hold that Article I, § 28, and Article VI, § 21, considered together and in the light of the above cited cases, mean that final determination of the question whether the contemplated use of any property sought to be taken under the Law here in question is public rests upon the courts, but that a legislative finding under said law that a blighted or unsanitary area exists and that the legislative agency proposes to take the property therein under the process of eminent domain for the purpose of clearance and improvement and subsequent sale upon such terms and restrictions as it may deem in the public interest will be accepted by the courts as conclusive evidence that the contemplated use thereof is public, unless it further appears upon allegation and clear proof that the legislative finding was arbitrary or was induced by fraud, collusion or bad faith." Relator here makes no such allegations.

Relator attacks the taxing and financing aspects of the acts on grounds other than lack of public purpose and we will consider these arguments next. First, relator asserts that the tax benefits granted to private developers financed by an au-

thority result in non-uniform taxes on the same class of subjects, contrary to Art. X, Sec. 3, 1945 Mo.Const., i. e., such benefits constitute discrimination against industries that secure their own financing and make the same socio-economic contribution to the city. As respondent correctly points out, however, ". . . The power to classify for tax purposes is primarily in the legislature and not in the courts . . . [I]t is sufficient if the court, on review, may find them supported by 'justifiable reasoning.'" Barhorst v. City of St. Louis, 423 S.W.2d 843, 846 (Mo. banc 1967). Relator cites two cases from foreign jurisdictions which are distinguishable and we cannot say that the classification here is arbitrary. Industry will not be attracted to blighted, insanitary and undeveloped areas absent incentives to offset the burdens. Furthermore, the decision to grant ad valorem tax relief under Sec. 100.570 of the act is conditional upon a three-fourths vote of the governing body of the city, thus providing an important safeguard that the exemption will not be granted where it is not necessary for the promotion or execution of a development project. The legislature is squarely authorized to grant tax relief to industries involved in redevelopment projects under Art. X, Sec. 7, 1945 Mo.Const., which reads in pertinent part, "For . . . the reconstruction, redevelopment and rehabilitation of obsolete, decadent or blighted areas, the general assembly . . . may provide for such partial relief from taxation of the lands devoted to any such purpose . . . upon such terms, conditions, and restrictions as it may prescribe."

Relator next argues that the tax exemptions violate Art. X, Sec. 7, quoted above, in that the act provides for the development of "blighted, insanitary and *undeveloped* industrial areas." "Undeveloped" areas, relator contends, include far more territory than could qualify as obsolete, decadent or blighted, and the development thereof cannot be equated with "*recon*struction, *re*development or *re*habilitation."

"Undeveloped industrial area" is defined by Sec. 100.310(18) of the act as follows: ". . . any area which by reason of defective and inadequate street layout or location of physical improvements, obsolescence and inadequate subdivision and platting contains vacant parcels of land not used economically; contains old, decaying, obsolete buildings, plants, structures; contains buildings, plants and structures whose operation is not economically feasible; contains intermittent commercial and industrial structures in a primarily industrial area; or contains insufficient space for the expansion and efficient use of land for industrial plants amounting to conditions which retard economic or social growth, are economic waste and social liabilities and represent an inability to pay reasonable taxes to the detriment and injury of the public health, safety, morals and welfare."

Thus, by definition, an undeveloped area is considered such because its development has been stunted or has become defective in some way. It is difficult to imagine an "undeveloped industrial area" as above defined which has not undergone earlier development of some kind; otherwise how could there be defective and inadequate street layout or location of physical developments, or inadequate subdivision and platting with vacant parcels not used economically, or obsolete plants, or insufficient space for efficient use of land for industrial plants creating economic waste and conditions retarding economic and social growth, as well as inability to pay reasonable taxes? The fact of lack of development in a particular area may itself be caused by surrounding urban decay and blight. We do not agree with relator's contention that "the law overreaches by including undeveloped industrial areas under the possible areas which may be blighted." Nor does the fact that land is vacant mean it cannot be considered "blighted." It may well be vacant because it no longer meets the economic and social needs of modern city life and progress. Oliver v. City of

Clairton, 374 Pa. 333, 98 A.2d 47, 52 (1953). As respondent points out, the purpose of the act is to cure urban ills; the definition does not include virgin territory or "pristine wilderness" which might be put to use, but is limited to land which is unimproved or unused by virtue of one of the developmental defects listed in the defining statute. These areas are certainly subject to "rehabilitation." Finally, we note that before any area is approved for project development, the governing body of the city must determine that such development is necessary in the interest of the public health, safety, morals or welfare of the residents of the city, Sec. 100.320; Art. VI, Sec. 21, 1945 Mo.Const.

■ Returning to eminent domain, relator next contends that the power of eminent domain granted to an authority under the contract will impair contracts (e. g., between lessee and lessor) and constitutes an irrevocable grant of privileges in violation of Art. 1, Sec. 13, 1945 Mo.Const. Relator cites no cases in support of this view and we find both contentions to be without merit. It has long been settled that contracts must yield to the power of eminent domain, and no constitutional right is violated if compensation is made. "There enters into every engagement the unwritten condition that it is subordinate to the right of appropriation to a public use." City of Cincinnati v. Louisville & Nashville R. R. Co., 223 U.S. 390, 400, 32 S.Ct. 267, 269, 56 L.Ed. 481 (1912); see also Land Clearance for Redevelopment Corporation v. Doernhoefer, 389 S.W.2d 780 (Mo.1965). Relator further argues that since the act permits the authority to acquire private property deemed necessary for a project by eminent domain and also permits the authority to sell any of the land in a project area to a developer, the act therefore "provides the new business the special privilege of acquiring the desired property in every case." This argument is also unsound. The act does not invest a right or privilege in a person or class of persons to the exclusion of others and in derogation of common right, State ex inf. Chaney v. West Missouri Power Co., 313 Mo. 283, 281 S.W. 709, 713 (1926). Necessarily, the power of eminent domain cannot be possessed by all, but the "privilege" of becoming a developer or a purchaser is open to all who can meet the covenants, conditions and restrictions deemed in the public interest as to uses to be made of the property. Sec. 100.410.

■ Sec. 100.430 of the act permits an authority to issue bonds which are to be paid, both principal and interest, exclusively from revenues of the projects financed with the proceeds of the bonds. Section 100.430(4), however, provides that ". . . such bonds may be additionally secured by a pledge of any loan, grant or contributions, or parts thereof, from the federal government or other source . . . ." Section 100.530 of the act provides that any public body may ". . . (8) Lend, grant or contribute funds to an authority [and] (10) Enter into agreements, which may extend over any period . . . respecting action to be taken by such public body pursuant to any of the powers granted by this law . . . ." On the basis of these provisions, relator argues that the bonds issued by an authority are payable from sources which include tax revenues of a public body, and thus constitute an "indebtedness" without voter approval, contrary to Art. VI, Sec. 26(a) to 26(f) inclusive, 1945 Mo.Const. We do not agree. It is well established by the "special funds" doctrine that ". . . If the taxpayer of the city cannot be taxed to pay the bonds, the constitutional limitation does not apply . . . If the obligation to be incurred is payable solely from income derived from the operation of the proposed improvement, the obligation is not considered to be debt of the city within the meaning of the constitutional restrictions . . . ." Petition of City of St. Louis, 364 Mo. 700, 266 S.W.2d 753, 755 (1954).

We must ask then whether revenues from the taxpaying public can be used to retire the bonds under the act. The authority itself has no power to tax. The possibility that tax revenues may be granted to an authority by a public body is limited by Sec. 100.450, which provides that ". . . neither the municipality, the county or the state shall be liable thereon nor in any event shall such bonds be payable out of any funds or properties other than those acquired for the purposes of this law and such bonds shall not constitute an indebtedness within the meaning of any constitutional or statutory debt limitation or restriction." Thus as respondent succinctly states, ". . . under the statutory provisions no tax money not specifically raised for such purpose can be used to pay the bonds. Since such tax money cannot be used to pay the bonds, the bonds would not constitute an indebtedness within the meaning of the constitutional provisions. The only conceivable method by which tax money could be used as a 'loan, grant or contribution,' as provided in Sec. 100.430(4), would be for that tax money to be specifically acquired for the purpose of the Planned Industrial Expansion Authority. This would require a vote." Further, we think the legislature, by its express limitation that the bonds are not to constitute an indebtedness within the meaning of the constitutional provision, has made it clear that tax revenues are not to be used for the payment of the bonds and that the bonds are not in fact an indebtedness of the city. Bader Realty and Investment Co. v. St. Louis Housing Authority, 358 Mo. 747, 217 S.W.2d 489 (banc 1949).

Finally, relator contends that the authority may not issue bonds bearing a higher rate of interest than 6% per annum, a limitation expressly stated in Sec. 100.440 of the act, effective in 1967. In 1969, however, the general assembly enacted Sec. 108.170, RSMo (supp.1974), which provides in part:

"1. Other provisions of law to the contrary notwithstanding, any and all bonds including revenue bonds hereafter issued under any law of this state by any county, city, town, village, school district, educational institution, drainage district, levee district, nursing home district, hospital district, library district, road district, fire protection district, water supply district, sewer district, housing authority, land clearance for redevelopment authority, special authority created under section 64.920 RSMo, authority created pursuant to the provisions of chapter 238 RSMo, or other municipality, political subdivision or district of this state . . . may bear interest at a rate not exceeding eight percent per annum if sold at public sale after giving reasonable notice of such sale . . . ."

Relator contends that the St. Louis authority's plans to issue bonds at an interest rate of 8% would be improper; that where a statute enumerates the subjects or things on which it is to operate, it is to be construed as excluding from effects all those not expressly mentioned, Parvey v. Humane Society of Missouri, 343 S.W.2d 678 (Mo.App.1961). We find, however, that although a planned industrial expansion authority is not expressly mentioned in Sec. 108.170, such an authority falls within our definition of "municipality", which is expressly included in the statute. As we stated in St. Louis Housing Authority v. City of St. Louis, 361 Mo. 1170, 239 S.W.2d 289 (banc 1951), which held the St. Louis Housing Authority to be a municipality for certain purposes, ". . . Municipality now has a broader meaning than 'city' or 'town', and presently includes bodies public or essentially governmental in character and function . . . ." 239 S.W.2d at 294.

Section 100.390 of the act provides that ". . . . an authority shall constitute a public body corporate and politic, exercising public and essential governmental functions." An examination of its powers and duties as outlined in the act indicate that an authority is a public corporation which is to perform an essential public service, and thus falls within the broad definition of "municipality" so as to be included in Sec. 108.170, supra. See also State ex rel.

**49**

Housing Authority of St. Louis County v. Wind, 337 S.W.2d 554 (Mo.App.1960).

 Having found that the bonds of a Planned Industrial Expansion Authority are included within the provisions of Sec. 108.170, the question then becomes whether this latter statute constitutes a repeal of Sec. 100.440 by implication. We have held that where a later statute indicates a different allowable interest rate on bonds than an earlier statute, the two are repugnant and the latter statute controls. For example, in Edwards v. St. Louis County, 429 S.W.2d 718 (Mo. banc 1969), this court was faced with two conflicting statutes, one providing that St. Louis County could issue bonds bearing interest at a rate not exceeding 4% per annum, and a later statute (the predecessor of Sec. 108.170) providing that a county could issue bonds at a rate not exceeding 6% per annum. Finding that the two statutes could not be reconciled, the court stated, " . . . [T]he last act of the legislature, if completely repugnant to a prior act, must be construed as repealing the prior act by implication, to the extent of such conflict, and is deemed to express the intent of the legislature . . . And the principle is applied even to the extent of the repeal (pro tanto) of a special statute by a later general statute if there is such total conflict that the two cannot stand together, and the legislative intent is fairly shown." 429 S.W.2d at 721. The court held that the rates of interest provided in the two statutes were totally repugnant, and therefore the latest legislative enactment should govern. Because an authority under the act is a municipality within the definition of that term, and is therefore included in Sec. 108.170, Sec. 100.440 of the act is repealed by implication insofar as it is inconsistent with Sec. 108.170, and an authority may issue bonds bearing an interest rate not exceeding 8% per annum.

For these reasons, the relief sought is denied and judgment is entered in favor of the respondents.

All of the Judges concur.