STATE of Missouri ex rel. Oliver DEVANSSAY and Patrick W. Bellinger, Relators,

v.

The Honorable Thomas F. McGUIRE, Judge of Division 2 of the Circuit Court of the City of St. Louis, Missouri, Respondent.

No. 43747.

Missouri Court of Appeals, Eastern District, Division Four.

July 28, 1981.

Motion for Rehearing and/or Transfer to Supreme Court Denied Sept. 21, 1981.

Application to Transfer Denied Nov. 10, 1981.

William J. Travis, St. Louis, for relators.

Gerard T. Carmody, St. Louis, for respondent.

Stolar, Heitzman, Eder, Seigel & Harris, Charles A. Seigel, Harvey A. Harris, St. Louis, for amicus curiae—Wash. U., etc.

Michael E. Hughes, Asst. City Counselor, St. Louis, for amicus curiae—City of St. Louis.

Lashly, Caruthers, Thies, Rava & Hamel, Rexford H. Caruthers, St. Louis, for amicus curiae—Jean Carter, Gary & Jean Rummelhoff, Barry & Patricia Suntrup, Carlton & Mary Pearse, Charles F. & Jenny Kade, and Marilyn Nathan.

SMITH, Judge.

This matter is before us following the issuance of our preliminary writ of prohibition. Relators are the owners of real estate located on Waterman Avenue in the City of St. Louis. Waterman Redevelopment Corporation (Waterman) is an urban redevelopment corporation organized under the provisions of Chapter 353 RSMo 1978. Pursuant to Ordinance 57882 of the City of St. Louis it has been given authority to redevelop the block of Waterman Avenue containing relator's property. As part of that authority Waterman has been granted the power of eminent domain to acquire property necessary to implement its redevelopment plan. Following unsuccessful negotiations to acquire relators' property, Waterman filed its suit for condemnation. Relators challenged Waterman's right to condemn on the basis that the ordinance approving the development plan and granting eminent domain was arbitrary and void because the development plan submitted by Waterman and approved by the city did not contain the "detailed statement of the proposed method of financing the redevelopment" required by the redevelopment enabling Ordinance, 29.080(15). Following an evidentiary hearing respondent upheld the validity of Ordinance 57882, denied relators' motion to dismiss Waterman's petition and ordered condemnation and the appointment of commissioners to determine the relators' damages from the taking. Our preliminary writ followed, prohibiting any further proceedings by the trial court. We now quash that preliminary writ.

Initially, the parties have joined issue over the applicability of prohibition in this

case. The case law in this state concerning the use of prohibition is not totally consistent nor reconcilable. As good a statement as any of the utilization of the writ is found in *State ex rel. Henry v. Cracraft*, 237 Mo. App. 194, 168 S.W.2d 953 (1943) [1–4].

"The purpose of the writ of prohibition is to prevent an inferior court from assuming jurisdiction with which it is not legally vested, in cases where wrong, damage, and injustice are likely to follow from such action. It does not lie as a rule for grievances which may be redressed in the ordinary course of judicial proceedings by other remedies provided by law. It is to be used with great caution and forbearance for the furtherance of justice and to secure order and regularity in judicial proceedings and should be used only in cases of extreme necessity. Nor will it ordinarily issue in a doubtful case."

■ Condemnation proceedings, by their nature, present circumstances where the writ may have application. Two determinations must be made in a condemnation case. First, the court must determine whether the condemnation is authorized by law—i. e.: is there jurisdiction over the condemnation proceeding. This determination may involve one or more of several requirements—is there constitutional, statutory or ordinance authority for the exercise of eminent domain (*State ex rel. Gove v. Tate*, 442 S.W.2d 541 (Mo. banc 1969)); is the taking for a public use (*State ex rel. Gove v. Tate, supra; State ex rel. Clothier v. Yeaman*, 465 S.W.2d 632 (Mo. banc 1971)); has the condemning authority complied with the conditions precedent to bringing the action (*State ex rel. Weatherby Advertising Co., Inc. v. Conley*, 527 S.W.2d 334 (Mo. banc 1975)). The trial

court's determination on these issues, favorable to the plaintiff is not appealable. *State ex rel. Clothier v. Yeaman, supra.*

Secondly, the court must establish the landowner's damages from the taking. At that stage, commissioners are appointed to assess the landowner's damages and upon payment of the commissioners' award the condemning authority acquires the property and may proceed to utilize it as prayed in its petition for condemnation. Either party may request a jury trial to establish the landowner's damages and only after that trial has concluded is the case appealable. At that time the question of the authority to condemn first becomes an issue for appeal. Obviously, by the time the matter can be resolved by an appellate court the property condemned has been utilized by the condemning authority and is no longer in the condition it was when the condemnation began. Frequently, as will be true in the case before us, the utilization of the property by the condemning authority will have resulted in the destruction of improvements on the property or a change in its nature so as to render it unusable for its prior purposes. In such a situation it may well be impossible to adequately redress the landowner for his loss resulting from the invalid taking.[1]

In recognition of this practical result, the appellate courts have utilized the writ of prohibition to review challenges to the authority to condemn "where usurpation of jurisdiction or an act in excess of same is clearly evident." *State ex rel. Clothier v. Yeaman, supra. See also State ex rel. Gove v. Tate, supra; State ex rel. Weatherby Advertising Co., Inc. v. Conley, supra.*[2] Of course, final determination that that crite-

1. Much of the difficulty referred to could be obviated if the order of condemnation were an appealable order. Such a change in the law is not within this court's province.

2. Respondent relies upon *State ex rel. Graham v. Seehorn*, 246 Mo. 541, 151 S.W. 716 (banc 1912) to support the contention that prohibition does not lie to challenge a finding of authority to condemn. As pointed out in *State ex rel. Clothier v. Yeaman, supra*, that case is accurately cited for that proposition. The *Clothier*

court did not, however, approve the proposition, it simply referred to it. We do not believe the absolutism of *Seehorn* is binding for two reasons. One, the proposition in that opinion upon which respondents rely commanded the votes of only three of the seven judges. Two, *Gove, Weatherby* and *Clothier* all established that the Supreme Court has refused to apply and presumably has rejected the absolutist approach of *Seehorn*.

ria has been met cannot be made until after the issuance of the preliminary writ, briefing and argument. The appellate court in issuing its preliminary writ does not decide that prohibition is proper; it only decides that on the application before it reasonable grounds exist to believe that an improper exercise of jurisdiction having consequences sufficient to justify a writ may have occurred. This is a discretionary determination.

■ Under the redevelopment plan here, the property of relators is to be acquired in order to demolish the four-family apartment on it. If the trial court lacks jurisdiction to entertain the condemnation proceeding the damage to relators from the destruction of their property prior to appeal may well be beyond redress and would result in injustice. We conclude that prohibition is a proper method to prevent such alleged injustice. We turn to the merits.

■ Relators place their reliance on *Maryland Plaza Redevelopment Corp. v. Greenberg*, 594 S.W.2d 284 (Mo.App.1979). In that case we recognized that the power of eminent domain is awesome in a society structured upon the right of private ownership of property. Before that power may be exercised it must be demonstrated that the use for which the taking occurs is a public one. In *Annbar Associates v. West Side Redevelopment Corp.*, 397 S.W.2d 635 (Mo. banc 1965), the Supreme Court upheld Chapter 353, RSMo 1959, the Urban Redevelopment Corporation's Law, against an attack that it allowed the taking of private land for a private use. The thrust of that opinion is that redevelopment of blighted urban areas is in the public interest and is therefore a public use. Chapter 353 constitutes the statutory authority upon which the St. Louis ordinances are based and under which Waterman exists. Implicit in the "public use" concept is the idea that authority for redevelopment, and for the exercise of eminent domain in connection therewith, should be granted only for projects which will in fact provide the redevelopment for the blighted area contemplated by Chapter 353. St. Louis' enabling Ordinance, 29.080,

contains a listing of information deemed necessary by the Board of Aldermen (and its advisor the Community Development Agency) to enable it to make it legislative determination to approve or disapprove a specific redevelopment plan. Obviously, any viable redevelopment plan must have an adequate financial base. The Board must have before it information to determine that such base exists before it can realistically assess the viability of the plan proposed and subparagraph (15) of the ordinance requires that such information be included in the redevelopment plan.

This is particularly important when redevelopment corporations are to provide the redevelopment. Unlike the usual condemnation situation involving either governmental entities or utilities with assets independent of the project for which condemnation is sought, redevelopment corporations are established for the purpose of redevelopment only (see Chapter 353) and usually have few or no assets themselves. In *Maryland Plaza*, we adverted to the danger to owners of land in blighted areas from redevelopers incapable of effectuating a responsible development of the area. Obviously, partial and incomplete demolition of an area may exacerbate the blight and seriously damage those private parties still owning land in the area, and property already taken under an abandoned redevelopment plan can hardly be said to have achieved a "public use." The legislating authority must be aware of these problems and in assessing the merits of a proposed redevelopment plan must have before it information to determine the availability of adequate methods of financing to complete the project. To approve a redevelopment plan without such information would be arbitrary. This is why the enabling ordinance requires the "detailed statement of the proposed method of financing the redevelopment." We believe that the holding of *Maryland Plaza* was a recognition of these principles and a finding that the Board of Aldermen there lacked sufficient information on projected financing to make a reasoned judgment on the viability of the

project. We do not read *Maryland Plaza* to impose any particular requirements on the statement of financing or to hold that the validity of the Board's action can be determined only from the information contained in the financing section of the plan or only from the body of the plan itself. It is up to the Board of Aldermen to review the entire plan and determine its feasibility.

"... [T]he power and obligation to make a determination as to whether the method of financing is in sufficient detail and whether the parties proposing the plan are financially and otherwise responsible is first vested in the legislative body of the city which made that determination before this suit was filed." *Annbar Associates v. West Side Redevelopment Corp., supra,* [20]. *See also Parking Systems, Inc. v. Kansas City Downtown Redevelopment Corporation,* 518 S.W.2d 11 (Mo.1974) [11]; *Allright Missouri, Inc. v. Civic Plaza Redevelopment Corp.,* 538 S.W.2d 320 (Mo. banc 1976) [6].

■ If the determination of the legislative body is fairly debatable, we cannot hold the ordinance to be arbitrary and void. *Allright Missouri v. Civic Plaza Redevelopment Corp., supra.* In determining the propriety of the Board's action, we are not limited to the redevelopment plan itself. It is to be expected that public hearings (held in this case) before the Community Development Agency and the Board of Aldermen or one of its committees would develop in more detail, add to or clarify the plan as submitted. This additional material may be considered in determining whether the action of the Board of Aldermen was arbitrary. *Parking Systems, Inc. v. Kansas City Downtown Redevelopment Corp., supra,* [11]; *Allright Missouri Inc. v. Civic Plaza Redevelopment Corp., supra,* [6]. It is, after all, the validity of the ordinance that is under review not the proposed plan. That is not to say that the plan can omit the detailed financing statement required by 29.080(15) but it is to say that in determining the sufficiency of the methods of financing parole information may be considered by the Board and by a reviewing court.

■ We also mention that the enabling ordinance refers to a "detailed statement of the proposed method of financing." We do not interpret "method of financing" to be synonymous with "financing." Relators have devoted much of their argument to the proposition that the plan must contain statements of committed financing or committed financiers. We disagree. The plan must contain a description of the method by which the redeveloper proposes to obtain the money necessary to complete the redevelopment. This description must be sufficiently detailed to afford the Board a basis for determining its feasibility. It must be something more than a "wish list" or the indefinite generality found in *Maryland Plaza.* We recognize that in this economic period it would be nearly impossible to delineate with particularity the precise sources of financing. The ordinance does not require it and neither do we.

■ With these guidelines in mind we have carefully reviewed the development plan as a whole and the material before the Board. While the financing statement is somewhat general, it is not indefinite. It lists various specific methods of prospective financing for each of the various aspects of the project. In addition, the plan reflects that the redeveloper and its affiliated companies have a $400,000 equity in the area to be developed; that the area to be developed is reasonably small (one block); that the cost of the two or three additional parcels to be acquired by the redeveloper is $40,000; that the other properties are to be improved by their owners with assistance in arranging financing by the redeveloper; that one or two parcels are to be cleared for playground space by a private school located in the redevelopment area, at its expense; that by approval of the plan the City of St. Louis will commit itself to expenditure of money for public improvements (mostly streets) and to designating areas of the redevelopment as eligible for government loans and subsidies; that the City will grant tax abatement to the redeveloped property. At hearings it was further devel-

oped that two banks had given oral commitments to financing the keystone building in the area; that one of those banks had orally committed to additional financing of other buildings if the first building was successful; that financing for another major building was to be sought from the Missouri Housing Development Agency and the U. S. Department of Housing and Urban Development; five private developers had indicated strong interest in obtaining financing for redevelopment within the project; a third bank was interested in financing redevelopment in the project area as it had done in the surrounding areas; that present owners in the area were committed to rehabilitate their properties (including relator Bellinger and some partners of his who owned property in the area other than that for which condemnation was sought); that Waterman's affiliates in the project had assets of approximately $50 million.

From the above we cannot find arbitrary action in enacting the ordinance. There was evidence at the hearing in the trial court that the substantial commitments of the redeveloper and its affiliates in the area could generate a financing capacity in excess of the $4.2 million needed for the entire redevelopment. We must presume a certain expertise in the Community Development Agency and Board of Aldermen of the potential of financing in the City of St. Louis and through governmental agencies, which expertise those bodies could apply in assessing the financial viability of the redevelopment based upon the redevelopers equity and financial resources. We conclude that on the evidence before the Board the question of the adequacy of the methods of financing the redevelopment was at least fairly debatable and the passage of Ordinance 57882 was not arbitrary.

Our preliminary writ of prohibition is quashed.

SATZ, P. J., and SYNDER, J., concur.