James P. TIERNEY, et al., Appellants,

v.

The PLANNED INDUSTRIAL EXPANSION AUTHORITY OF KANSAS CITY, Missouri, et al., Respondents.

STATE ex rel. James P. TIERNEY, et al., Relators,

v.

The Honorable H. Michael COBURN, Circuit Judge, et al., Respondents.

Nos. 69317, 69528.

Supreme Court of Missouri, En Banc.

Dec. 15, 1987.

Rehearing Denied Jan. 20, 1988.

James P. Tierney, Terry J. Satterlee, Alfred R. Hupp, Jr., Kansas City, for appellants.

Lowell L. Smithson, David A. Sosinski, John M. May, John F. Ingraham, Richard N. Ward, Robert J. Campbell, Kansas City, for respondents.

James C. Bowers, Jr., Donna L. Stanford, Kansas City, Irvin Dagen, Gregory R. Smith, Sarah Siegel, Jeanne Vatterott, St. Louis, Howard C. Wright, Jr., City Atty., Springfield, John Simon, Asst. Atty. Gen., Jefferson City, Max W. Foust, Steven D. Steinhilber, Kansas City, for amicus.

## OPINION IN
## CONSOLIDATED ACTIONS

BLACKMAR, Judge.

### The Dispute

The Tierneys, plaintiffs in 69317 and relators in 69528, are the owners of land at 1500 Baltimore in downtown Kansas City, containing a structurally sound and usable building. The Planned Industrial Expansion Authority of Kansas City, Missouri (PIEA) instituted condemnation proceedings in accordance with Chapter 100, RSMo. The owners filed suit against PIEA and others seeking a declaratory judgment that the condemnation proceedings were invalid and also damages on account of "condemnation blight." Following hearing, the trial judge overruled the owners' challenge to the condemnation proceedings. He had previously dismissed the three-count petition in the civil action, but allowed the owners to raise all their objections in the condemnation hearing. The owners then sought prohibition or mandamus in the Missouri Court of Appeals, Western District. That court issued a preliminary rule in prohibition which it made absolute after argument, concluding that PIEA had not complied with certain mandatory requirements of the statutes and therefore had no power to go forward with the condemnation proceedings. Another panel affirmed the judgment of dismissal of the declaratory judgment action, on the ground that the writ remedy was adequate. We granted transfer in both cases because of the important issues involved. We now quash the preliminary rule in prohibition and affirm the judgment of dismissal.

In 1967 Missouri adopted the Planned Industrial Expansion Act, Section 100.310, et seq., RSMo 1986. The act provides for the establishment of the Planned Industrial Expansion Authority of Kansas City, Mis-

souri (PIEA) as a body corporate and politic, having the authority to acquire land in "blighted", "insanitary" or "undeveloped industrial" areas, 100.310(2), (11), (18), RSMo 1986, by eminent domain if necessary, and to dispose of the land to redevelopers, in accordance with redevelopment plans, with approval at various stages by it and by the City Council of Kansas City. We are commanded by Section 100.610 to construe the act "liberally to effectuate the purposes of the law."

On August 13, 1981, the City Council enacted an ordinance designating a tract bounded by both sides of Wyandotte and Central, between I–70 (15th Street) on the north and 17th Street on the south, as a "blighted, insanitary or undeveloped industrial area." This ordinance did not include the Tierney property.

On July 22, 1982 the council enacted another ordinance designating as blighted[1] the area covered by the 1981 ordinance, together with a tract to the west not involved in these proceedings, and a tract to the east consisting of the west side of Baltimore Avenue between I–70 (15th Street) and 16th Street and containing the Tierney property. The entire tract covered by the 1982 ordinance contains 22.7 acres.

On September 28, 1982, the council enacted an ordinance approving a General Development Plan submitted by PIEA for the area covered by the 1982 ordinance. The plan had been previously considered and approved by the City Plan Commission. This ordinance recited the existence of a "general plan for the development of the community as a whole," and contained the finding that the PIEA plan was in conformity with the general plan.

On December 8, 1982, PIEA accepted a contract proposal by K–A Company for the redevelopment of the area. The owners contend that this proposal substantially

changed the development plan as approved by the City Council the previous September, to such an extent that it invalidated the prior approval.

On November 21, 1985, PIEA adopted a resolution authorizing the commencement of condemnation proceedings. On November 27, 1985, it filed a petition for condemnation of the area covered by the 1982 ordinance. The declaratory judgment action was filed a few minutes later. The court held a hearing on the condemnation petition and, after substantial deliberation, entered an order on July 22, 1986 sustaining the petition in condemnation and appointing commissioners. The relators filed a prompt petition in the court of appeals seeking mandamus or prohibition. Timely notice of appeal in the civil action had previously been filed.

### Challenges to Eminent Domain Proceeding

In *State ex rel. Washington University Medical Center Redevelopment Corporation v. Gaertner,* 626 S.W.2d 373 (Mo. banc 1982) we held that a landowner could not file a counterclaim in a condemnation action. This ruling poses a problem as to how an interested person may challenge the legality of an attempted condemnation in the appellate courts. If the trial court upholds the condemnation then the condemnor may take possession on paying the damages assessed by the commissioners and the property may be irreversibly altered before the case can be heard by the appellate courts.

There are cases in which the lawfulness of the condemnation has been determined in a prohibition proceeding.[2] To succeed the relator must show that the condemnation proceedings are unauthorized by law. If so, the trial court lacks

---

1. For economy we will use "blighted" as a collective term for land meeting any of the statutory tests of "blighted," "insanitary," or "undeveloped industrial." Section 100.310(2), (11), (18).

2. *State ex rel. Devanssy v. McGuire,* 622 S.W.2d 323 (Mo.App.1981), containing an instructive exposition of the problems of a landowner who

would challenge the propriety of eminent domain proceedings; *State ex rel. Weatherby Advertising v. Conley,* 527 S.W.2d 334 (Mo. banc 1975), *overruled on other grounds State ex rel. Missouri Highway and Transportation Commission v. Anderson,* 735 S.W.2d 350 (Mo. banc 1987).

subject matter jurisdiction. When the disputes are essentially factual the claim of lack of jurisdiction is extremely difficult to sustain because the trial judge has the authority to resolve fact issues in the hearing on the condemnation petition. Issuance of a preliminary rule in prohibition, furthermore, is solely within the discretion of the appellate court.

It is also possible to file a civil action against the condemning agency seeking injunctive or declaratory relief.[3] This may provide a factual record, but unless the plaintiff owner is successful in the trial court there is no assurance that the condemnor will not take possession and alter the property before the appeal can be pursued. Matters of interim relief, in the form of temporary injunction, stay, or expediting of the appeal, require the exercise of judicial discretion.

There is no sure way to assure the owners a full dress appeal, in advance of the taking. If the trial court decides against them they may often have to be content with the "just compensation" the law requires. In this case, however, there is a factual record which we may resort to in determining the legal issues in both proceedings. We conclude that the condemnation is not illegal for the reasons assigned.

### The Finding of Blight

The owners argue that their property was not shown to be "blighted", "insanitary", or "undeveloped", and that it could not be properly included in the area covered by the ordinance, by reason of *Mo. Const. Art. I, Sec. 28*, prohibiting the taking of private property for private use.

They do not challenge the basic concepts underlying urban redevelopment, as recognized by *State ex rel. Dalton v. Land Clearance Authority*, 364 Mo. 974,

270 S.W.2d 44 (1954) and confirmed by numerous later decisions.[4] If the proper findings are made by the legislative authority, land may be acquired for redevelopment or industrial expansion and sold to other private interests, even though the owners are not willing to sell. Naboth may not always retain his vineyard, but must sometimes be content with just compensation. Ahab need not resort to major force, but may simply file a petition and pay the award. I Kings 21. Redevelopment of "blighted, substandard or insanitary" areas is a public purpose. Mo. Const., Art. I, Sec. 21. Whether a particular area is blighted, furthermore, is a matter for the legislative body to resolve.[5] Its authority controls unless its decision is shown to be so arbitrary and unreasonable as to amount to an abuse of the legislative process. *Allright Missouri, Inc. v. Civic Plaza Redevelopment Corporation*, 538 S.W.2d 320 (Mo. banc 1976).

The owners do not challenge these basic principles. They assert rather that the legislative findings in the case before us are so arbitrary and unreasonable that they cannot supply the jurisdictional base for eminent domain. Their property was not included in the 1981 ordinance, declaring a smaller tract to be blighted, but was included in a 1982 ordinance which added only unblighted property along the east side of Broadway and the west side of Baltimore. They argue that the addition of this unblighted property, without the required finding that the addition is necessary to attract redevelopers, contravenes the constitution and the statutes.

They do not challenge the proposition, established in *State ex rel. Atkinson v. Planned Industrial Expansion Authority of St. Louis*, 517 S.W.2d 36 (Mo. banc

**3.** *Allright Missouri, Inc. v. Civic Plaza Redevelopment Corp.*, 538 S.W.2d 320 (Mo. banc 1976) *cert. denied*, 429 U.S. 941, 97 S.Ct. 358, 50 L.Ed. 2d 311 (1976); *Parking Systems Inc. v. Kansas City Downtown Redevelopment Corp.*, 518 S.W.2d 11 (Mo.1974).

**4.** *See particularly, Annbar Associates v. West Side Redevelopment Corp.*, 397 S.W.2d 635 (Mo. banc 1965) *app. dismissed* 385 U.S. 5, 87 S.Ct.

41, 17 L.Ed.2d 4 (1966); *State ex rel. Atkinson v. Planned Industrial Expansion Authority of St. Louis*, 517 S.W.2d 36 (Mo. banc 1975), sustaining the law now before us.

**5.** *See generally*, Annotation, *What Constitutes a "Blighted Area Within Urban Renewal and Redevelopment Statutes,"* 45 A.L.R.3d 1096.

1975) and confirmed in other cases such as *Allright Missouri, Inc. v. Civic Plaza Redevelopment Corporation, supra,* that a blighted area may include parcels which are not themselves blighted if these parcels are necessary to provide a tract of sufficient size or accessibility to attract redevelopers. They say that the principle may be invoked by the addition of property only if there is an explicit finding of necessity, citing *Prudential Building and Loan Association v. Urban Renewal and Community Development Agency of Louisville,* 464 S.W.2d 629 (Ky.1971).

■ We do not agree. The city council is entitled to consider the area as a whole. Its authority is not limited simply because a part of the area covered by a proposed ordinance has already been declared blighted. Nor do the governing statutes or ordinances require an explicit finding to support the inclusion of properties which are not blighted. The conclusion that all included properties are reasonably necessary for the redevelopment of the area is implicit in the declaration of blight. We do not find the Kentucky case persuasive.

The owners next attack the legislative finding of blight, pointing out that 27% of the area found to be blighted consists of streets and alleys, and 37% of surface parking. They point out that when these figures are added to the more than 50% of the buildings which are sound structures the greater part of the property in the area cannot properly be described as blighted.

■ Even if we assume that an area may not be said to demonstrate a "predominance" of blight unless more than half of the ground area is blighted, the owners' argument is not sound. Streets and alleys exist to serve the adjoining properties, and partake of the character of these properties. Surface parking constitutes a two-dimensional use which inhibits other, more economically intense, uses. Streets and parking lots consume valuable urban land. The legislative authority may properly find that they contribute to a condition of blight. *Parking Systems, Inc. v. Kansas City Downtown Redevelopment Corporation,* 518 S.W.2d 11 (Mo.1974), is helpful on this issue.

■ The owners, finally, attack the concept of "economic underutilization" as a basis for condemnation. They suggest that almost all land could be put to a higher and better use, and argue that the concept of economic underutilization is so broad as to confer upon the legislative authority and PIEA the unlimited discretion to take one person's property for the benefit of another, contrary to *Mo. Const., Art. I, Sec. 28.*

We do not find the fault or the danger perceived. The concept of urban redevelopment has gone far beyond "slum clearance," and the concept of economic underutilization is a valid one. This is explicit in *State ex rel. Atkinson v. Planned Industrial Expansion Authority of St. Louis,* 517 S.W.2d 36 (Mo. banc 1975), sustaining the statutes governing this case. Centrally located urban land is scarce. The problems of assembling tracts of sufficient size to attract developers, and of clearing uneconomic structures, are substantial and serious. The willingness of the owners to sell is not controlling. We need not repeat all of the evidence which was before the city council tending to show that redevelopment of this area could promote a higher level of economic activity, increased employment, and greater services to the public. Industrial development is a proper public purpose. We do not sit as a court of appeal over the decisions of the council. The burden is on the owners to show that the finding of blight constitutes an arbitrary or unreasonable abuse of the legislative authority. They have not made this showing. *See, Allright Missouri, Inc. v. Civic Plaza Redevelopment Corporation,* 538 S.W.2d 320 (Mo. banc 1976).

### Absence of a General Plan

■ The owners argue that PIEA may not proceed to acquire their land by eminent domain because of failure of compliance with Section 100.400.1(3), RSMo 1986, providing as follows:

An authority shall not recommend a plan to the governing body of the city

until a general plan for the development of the city has been prepared.

If this contention has merit, it precludes all activity under the planned industrial expansion statutes until the city has adopted a general plan. We therefore consider the point before taking up the objections to the particular plan. The claim, however, is not well taken.

The owners concede that a City Master Plan was adopted in 1947. They point out, however, that Kansas City has greatly expanded its boundaries since that time. The present boundaries of the city are divided into 46 planning areas. Supplemental area plans exist for no more than 30 of these areas including the 1978 Downtown Area Plan, No. 14, which includes the Tierney property. The owners argue that the failure to extend the master plan to the remaining areas is a fatal defect, contending that a "general plan" must include the entire city.

The owners do not satisfy us that there is a violation of the general plan requirement. The area here in question adjoins the downtown business district. It is in the oldest portion of the city, at its very heart. The conditions on which the 1947 plan was based remain essentially unchanged. The city maintains a City Plan Commission with a professional staff, and also has the services of the staffs of the Land Clearance for Redevelopment Authority and of PIEA. There is no showing that the absence of plans for some outlying areas rendered the 1947 plan and the supplemental area plans any the less useful. The city authorities are entitled to exercise some discretion in the use of their resources, and might well conclude that some of the annexed areas were relatively stable, or not appropriate for industrial development, so that area plans were not priority items.

The text of the statute does not support the owners' claim, and we do not believe that it was intended that planned industrial development stand still until every square foot within the city limits is covered by a plan.

*Conformity to the General Plan*

■ Section 100.400.1(9), RSMo 1986, provides that the governing body of the city may approve a plan if it finds that the plan is "in conformity with the general plan for the development of the community as a whole."

Both the City Plan Commission and the City Council made the required findings. The owners argue, nevertheless, that the Downtown Industrial Area Plan of 1978 recommends that the land use for the area should remain "light industrial," and specifically rejects "core type uses, such as retailing, offices, and high density housing." That plan goes on to suggest that "high intensity core type uses, such as high-rise office, apartment and intense retailing should not be allowed so as not to detract from the economic revitalization of the Central Business District or the development of Crown Center and Pershing Square."

Relators point out that the PIEA plan makes provision for land use in the area as follows:

Proposed land uses within the project area shall be limited to facilities relating to commercial use such as office buildings, financial institutions, hotels, motels, parking structures, commercial support services and ancillary uses.

We find no disabling disharmony between the 1978 plan and the uses proposed in 1982. Under the city's zoning ordinances "commercial" zoning is "higher" than light industrial zoning, and the classifications are cumulative, so that commercial uses are permissible in a light industrial area. Planning is a continuing process, and a plan cannot remain static or inviolate. The City Plan Commission and the City Council are charged with the responsibility for comparing the PIEA proposal to the preexisting plans and determining whether there is substantial compliance. To the extent that there are differences, we must assume that the duly constituted authorities concluded that the preexisting plans should be modified. The owners would introduce inflexibility and invite close judicial

scrutiny, in a way not contemplated by the governing legislation.

## Compliance With Statutory Requirements

Section 100.400 sets out certain factual information which must be included in every plan. This information includes population and employment data for the relevant area; zoning proposals; information on necessary street and utility changes and projected figures on the amount of building construction. Examination of the plan itself shows that these requirements were substantially complied with. The plan specifically states that the population density of the area is .83 persons per acre and that the unemployment rate is 17.2%. The plan includes a specific estimate that 500,000 feet of office space would be built. It also states expressly that a change in zoning from M–1 to planned commercial was contemplated. It says that no changes in the existing sewer or water systems are foreseen, and that existing building codes and ordinances shall apply within the plan area. Exhibits attached to the plan contained graphic layouts which superimposed planned street configurations over existing streets. The plan, in short, contained the essential information which would permit members of the city council to make an intelligent, informed and appropriate legislative decision regarding approval of the plan. It is evident from the record that the council was assisted in its evaluation of the plan by several city agencies specifically charged with insuring the efficient and productive development of the city as a whole. The statutory requirements were devised to further this purpose. They should not be read as requiring that the council be informed of the precise placement of every brick before the duly appointed authority is even allowed to commence proceedings to acquire the property, and before the plan can be tendered to potential developers for bidding. The council had the means of information necessary for a studied decision.

The owners place strong reliance on *State ex rel. Maryland Plaza Redevelopment Corp. v. Greenberg*, 594 S.W.2d 284 (Mo.App.1979), holding that an ordinance approving the redevelopment plan of a private developer was invalid and insufficient to confer the power of eminent domain because the plan did not provide the Board of Aldermen with the required information as to the method of financing. The case is not very close to this one. There the land was to be acquired by a private redevelopment corporation organized under Chapter 353, RSMo, which would be responsible for paying any judgment ultimately rendered in favor of the owners. The financial resources of the developer were of vital importance, but the plan submitted gave virtually no information on this score. The holding has perhaps been somewhat qualified in *State ex rel. Devanssay v. McGuire*, 622 S.W.2d 323 (Mo.App.1981), which appears to relax the requirements for detailed financial information, and holds that the legislative body's conclusion that adequate information has been furnished is entitled to substantial weight.

The owners cite *State ex rel. Terrell v. Nicholls*, 719 S.W.2d 862 (Mo.App.1986) for the proposition that failure of compliance with the enabling ordinance will deprive the redeveloper of the power to condemn.

*Terrell* also involved a Chapter 353 private redevelopment corporation. The corporation failed to notify property owners of the terms of the redevelopment plan within ninety days of approval by the Board of Aldermen, as expressly required by the governing ordinance. The court of appeals held that this failure precluded the redevelopment corporation from exercising the power of eminent domain. The notification requirements were designed to give the owners the opportunity to redevelop their own property. The express violation of the ordinance deprived them of this opportunity. No such deprivation occurred in the present case. There has been no suggestion that the owners in this case were denied their statutory right to propose their own redevelopment plan. Section 100.-310(9), RSMo 1986. As our earlier discussion indicates, furthermore, the plan submitted to the council in this case is not

lacking in essential information, in the manner of the plan criticized in *Greenberg*.

### Modification of the Plan

 Relators complain that, even if the PIEA plan approved by the council complies with the statutory requirements, that plan was substantially modified by the proposals of the private contractor ultimately adopted by the PIEA. The proposal changed the configuration of several streets and called for an office building on relator's property rather than a hotel as originally contemplated. The argument fails to take account of the time sequence established by the statute. The city council approval of September 28, 1982, furnished the jurisdictional basis for acquisition of the property in the blighted area. This came before the plan was made available to developers for bidding. Jurisdiction is not lost because of what PIEA and the developers may later agree upon. Nor are the owners specially aggrieved by changes made after their property has become subject to condemnation.

It could hardly be expected that all details for the planned development could be spelled out at the time of council approval, or even at the time the initial contract is agreed to. There is no way to determine which potential developers might show interest, or what kind of development they might consider economic. Changes may be necessary to meet changing economic conditions, if uses contemplated in the initial plan are adequately provided by other new construction. We will not read the statutes in such a way as to frustrate their effectiveness, especially in view of the legislative command that they be construed "liberally to effectuate the purposes." Section 100.610. We are not persuaded that the modifications relied on by the owners represent a significant departure from the plan approved by the council. A "substantial modification" as described by Section 100.400.1(10), such as to require council approval, should be read as referring to a modification which would substantially alter the nature of the contemplated development. We find nothing of this sort in the record.

The city council retains ultimate control over the plan and any modifications. Section 100.400.1(10). The circumstances relied on by the owners do not divest the circuit court of jurisdiction over the eminent domain proceedings.

### The Damages Claim

We conclude that the trial court properly dismissed Count III of the civil action, which sought damages for "condemnation blight," on the basis of the suggestion in *State ex rel. Washington University Medical Center Redevelopment Corporation v. Gaertner*, 626 S.W.2d 373 (Mo. banc 1982). The defendants are the city, the Planned Industrial Expansion Authority of Kansas City, Missouri, K–A Company (the developer), Whitney Kerr, one of the partners in the developer, and Kansas City Corporation for Industrial Development, a not-for-profit corporation whose role is not precisely stated. There are obstacles to the claims against each of these defendants.

 Relief against the city is sought because of the passage of the blighting ordinance and the ordinance approving the initial redevelopment plan as submitted by PIEA. There is no precedent for holding a city liable for the actions of its governing body in adopting ordinances authorized by the planned industrial expansion act, which calls for the exercise of legislative judgment. The bare declaration of conditions found to exist in an area does not meet any accepted definition of "taking." When a blighting ordinance is passed, furthermore, there is no assurance that a developer will be found or that development will ever proceed.

 The claim against PIEA is based on its recommendation of the blighting and plan approval ordinances to the city council following its staff studies, and on its approval of K–A Company as a developer. PIEA is "a public body corporate and politic ... exercising public and essential governmental functions." Section 100.310(1), RSMo. Its duties consist of preparing general redevelopment plans for submission to the city council and considering proposals

submitted by developers for the redevelopment of areas found to be blighted. The owners seek to hold it civilly liable simply for performing its statutory functions. We likewise are aware of no precedent for this. Section 100.520, indeed suggests substantial limitations on the civil liability of the authority.

 The developer and Kerr have no governmental powers at all and do not possess the power of eminent domain. They are sought to be held simply for entering into a contract with PIEA on a matter within that agency's statutory authority. In doing this they violate no duty which they owe to the owners. No basis for the claim against the other defendant, Kansas City Corporation for Industrial Development, is suggested in the briefing.

It is apparent that the process of planned industrial development would be greatly inhibited if the governmental and private participants were held to the kind of liability sought to be imposed by Count III of the petition. We conclude that this count states no claim on which relief can be granted.

*Washington University Medical Center,* *supra,* involved a claim against a private urban redevelopment corporation established by Chapter 353, RSMo 1978. What the Court said about the possibility of such a claim in a separate action was obiter, because the actual holding was that a claim for "condemnation blight" could not be made by way of counterclaim in the condemnation action. A claim against a private corporation is free from some of the immunity problems that are present in this suit. The case relied on, therefore, does not furnish substantial precedent for these plaintiffs. The facts alleged in Count III, furthermore, seem substantially different from those alleged in the counterclaim in that case, in which the dominant theme was loss of rental income.

The owners also cite *Roth v. State Highway Commission,* 688 S.W.2d 775 (Mo. App.1985). The essential charge in that case was that the highway commission interfered with the rights of propertyowners by interceding with municipalities to frustrate the owners' attempts to get building permits, long before it instituted condemnation proceedings. The petition in effect charged that there had been a taking by the acts of agents of the condemning agency, which triggered the right to just compensation, before the processes of law were called upon to condemn the property. No claim of this sort is presented by Count III, which seeks relief based on the public acts of the defendants rather than on any interference with the owners.

 Any action of the kind sought to be maintained in Count III must be on a theory that there has been a "taking." Such actions are sometimes referred to as actions for "inverse condemnation," and may be maintained in spite of sovereign immunity to fulfill the constitutional command that property not be taken without just compensation. *Mo. Const. Art. I, Sec. 26.* *See Owen v. City of Springfield,* 741 S.W. 2d 16 (Mo. banc 1987) Rendlen, J., dissenting). The petition and other papers in this case do not state facts showing a taking, up to this point. There has been no abatement of the owners' rights in the property, which is leased through 1991. The owners, indeed, seek to forestall the acquisition by arguing that PIEA has no right to acquire the property, and have caused postponement of the taking up to this time by suing out an extraordinary writ.

After the Commissioners' award is filed, PIEA may "take" the property by paying the amount of the award into court. Both the owners and PIEA have the right for the review of that award by a jury. There is also the right to abandon the acquisition proceedings. S.Ct. Rule 86.06. Until the ultimate condemnation award is determined there can be no accurate determination as to whether there has been a taking, in advance of the statutory taking, which has not been adequately compensated.[6] Further consideration of the owners'

6. There may be multiple takings as a part of the same acquisition proceeding. *Missouri Highway* *and Transportation Commission v. Eilers,* 729 S.W.2d 471 (Mo.App.1987).

entitlement, if any, should be postponed until that time. We express no opinion as to what kind of action might be brought, what showing is required, or whether any facts warranting relief appear in this record.[7]

The judgment in Case No. 69317 is affirmed. The preliminary rule in Case No. 69528 is quashed.

BILLINGS, C.J., RENDLEN and HIGGINS, JJ., and MORGAN, Senior Judge, concur.

WELLIVER, J., dissents in separate opinion filed.

DONNELLY, J., dissents and concurs in separate dissenting opinion of WELLIVER, J.

ROBERTSON, J., not sitting.

WELLIVER, Judge, dissenting.

I respectfully dissent.

Our jurisdiction to transfer cases from the court of appeals is set forth in Mo. Const. art. V, § 10.

> Cases pending in the court of appeals shall be transferred to the supreme court ... because of the general interest or importance of a question involved in the case, or for the purpose of reexamining the law, or pursuant to supreme court rule.

Rule 83.03 provides:

> In any case in which a motion for rehearing has been overruled and an application for transfer under Rule 83.02 has been denied, the case may be transferred by order of this court on application of a party for any of the reasons specified in Rule 83.02, or for the reason that the opinion filed is contrary to a previous decision of an appellate court of this state.

The reasons for transfer specified in Rule 83.02 are: "because of the general interest or importance of a question involved in the case, or for the purpose of reexamining the existing law." We should not transfer a case to substitute our view of the facts.

I adopt the opinion of the Western District Court of Appeals as my dissenting opinion. The opinion authored by David J. Dixon, Judge in cause No. WD38633 and concurred in by Pritchard, J., Presiding and Shangler, J., follows verbatim.

"This action for extraordinary relief arises from a suit for condemnation filed by the Planned Industrial Expansion Authority (PIEA) of Kansas City, Missouri. The PIEA, claiming power to condemn under 'The Planned Industrial Expansion Law,' §§ 100.300–.620, RSMo Supp.1984,[1] filed a petition for condemnation to acquire relators' property at 1500 Baltimore, Kansas City, Missouri. Relators sought a writ of mandamus, or in the alternative, a writ of prohibition to halt the condemnation proceedings. This court issued a preliminary writ of prohibition on August 26, 1986.

"Aside from the inherent issue of the availability of the writ, the issues to be determined in this case are limited by the preliminary writ. Those issues are first, whether the PIEA development plan adopted by the City Council on September 28, 1982, sufficiently complies with §§ 100.-300–.620, RSMo., to permit the condemnation and, second, whether the developer's plan approved by the PIEA on December 8, 1982, so substantially changed the PIEA plan as to constitute a violation of the statutory scheme, particularly of § 100.400.1(10), which requires legislative approval for a change in the plan.

"Public activity concerning the area encompassing relators' property began several years ago. On June 15, 1978, the Kansas City City Council passed a resolution approving a development plan for the Downtown Industrial Area which includes

---

7. *See* Castle, Note, *"Condemnation Blight: Compensating the Landowner in Missouri,"* 48 Mo.L. Rev. 220 (Winter, 1983); Dunkin, Note, *"Denial of Landowner's Counterclaim: Another Obstacle on the Road to Just Compensation,"* 50 UMKC L.Rev. 353 (Fall, 1981).

1. The pertinent PIE statues in effect at the time this case arose are set out in RSMo Supp.1984. All statutory cites refer to RSMo Supp.1984 unless otherwise designated.

relators' property. Also in 1978, the Kansas City Corporation for Industrial Development caused a survey to be made of the condition of this area from 15th to 17th Streets, Baltimore to Broadway. This survey found no substandard properties on Baltimore or Broadway.

"Thereafter, Jerome Ogburn, President of PGAV/Community Resource Corporation, conducted a blight survey for the area from Central to Wyandotte, 15th to 17th Streets, known as the 16th and Central project area. He concluded that the 16th and Central project area was a blighted area, and this conclusion was corroborated in general terms at hearings before the City Plan Commission and the Zoning and Planning Committee of the City Council by Whitney Kerr, a partner in Kerr–Andersen (K–A) Company, and Richard Schoegler, the Executive Director of the PIEA. At the request of the PIEA, the City passed an ordinance on August 18, 1981, declaring the 16th and Central project area to be one of the City's blighted, insanitary or undeveloped industrial areas.

"Later, at the request of the PIEA, Ogburn and his firm expanded the blight survey to include the west side of the Baltimore from 15th Street to 17th Street, so that the 1500 Baltimore property was included in the blighted area. He then found the entire area to be blighted, although no substandard buildings were found in the expansion area itself. At the request of the PIEA, the City Council, after recommendation by the City Plan Commission, passed an ordinance declaring an area that included the west side of Baltimore from 15th Street to the south line of 16th Street, as well as the area covered by the initial ordinance, to constitute a blighted, insanitary or undeveloped industrial area.

"The PIEA then prepared a general development plan calling for solely commercial development of the area designated as blighted. The City Council approved PIEA's development plan in Ordinance No. 54369 on September 28, 1982. After advertising for redevelopment proposals, the PIEA approved a redevelopment proposal of K–A Company in December 1982.[2] This plan was neither submitted to nor approved by the City Council.

"On November 21, 1985, the PIEA adopted a resolution authorizing the commencement of condemnation proceedings against the 1500 Baltimore property. On November 27, 1985, the PIEA filed its petition for condemnation of the area. On that same day, relators filed an action for declaratory judgment contesting the right of the PIEA to take their property. The PIEA and other named defendants moved to have the petition dismissed. The motion was first overruled but after the PIEA moved for disqualification of the overruling judge, the case was transferred to Judge Coburn. Judge Coburn, upon a motion to reconsider, dismissed the petition for declaratory judgment with prejudice and proceeded with trial of the condemnation suit.[3] Five months after the trial of the condemnation suit, in July 1986, Judge Coburn sustained the petition for condemnation and appointed the commissioners to view the property. On August 20, 1986, relators filed their petition for extraordinary relief, and a preliminary writ of prohibition was granted on August 26, 1986.

"The first issue to be determined necessarily is whether prohibition should be made available in cases such as this. Although "[t]he case law in this state concerning the use of prohibition is not totally consistent nor reconcilable," *State ex rel. Devanssay v. McGuire*, 622 S.W.2d 323, 325 (Mo.App.1981), writs of prohibition have issued in condemnation cases.

"Prohibition was used in *State ex rel. Gove v. Tate*, 442 S.W.2d 541, 542 (Mo.

**2.** Relators include a 1985 development proposal with their exhibits. The 1985 proposal differs from both the PIEA plan and the December 1982 redevelopment proposal. Since the record does not indicate that the 1985 proposal was ever approved by the City Council or the PIEA, it is not necessary to consider here the substantial changes in the 1985 proposal makes in the PIEA plan.

**3.** The dismissal of the petition for declaratory judgment was affirmed in *Tierney v. Planned Industrial Expansion Authority*, WD38208 (Mo. App. Feb. 10, 1987).

banc 1969), to prevent condemnation when the court found that in addition to a non-public purpose for the taking there was no ordinance authorizing the city to proceed with condemnation. In *State ex rel. Clothier v. Yeaman,* 465 S.W.2d 632, 634 (Mo. banc 1971), a writ of prohibition was issued when the court found it was "clearly evident" that an attempt was being made to condemn private property for a nonpublic use. Prohibition was also found to be an appropriate remedy in *State ex rel. Weatherby Advertising Co. v. Conley,* 527 S.W.2d 334, 341–342 (Mo. banc 1975), in which the respondent judge was found to lack jurisdiction to proceed with condemnation because the condemning authority had failed to comply with the statutory conditions precedent before filing its petition for condemnation. Finally, in *Devanssay,* 622 S.W.2d at 324, a preliminary writ of prohibition was issued to allow review of the landowners' allegation that the ordinance approving a Chapter 353, RSMo 1978, urban redevelopment plan and granting the redevelopment corporation the power of eminent domain was arbitrary and void because the plan did not contain the " 'detailed statement of the proposed method of financing the redevelopment' " required by the redevelopment enabling ordinance.

"*Devanssay* provides an excellent discussion of the use of prohibition in condemnation proceedings and its reasoning is dispositive here.

"As is pointed out in *Devanssay,* the court, in a condemnation proceeding, must first determine whether the condemnation is authorized by law. *Id.* at 325. A finding that the petitioner has the right to condemn is interlocutory only and is not appealable by the landowner at that point. *Id.; State ex rel. Clothier,* 465 S.W.2d at 634. Second, the landowner's damages resulting from the taking must be established. Commissioners are appointed to assess the landowner's damages and upon payment of the commissioners' award into the court, the condemning authority acquires the property and may utilize it as prayed in the petition for condemnation. *Devanssay,* 622 S.W.2d at 325. Either party may contest the amount of the commissioners' award

and request a jury trial to determine damages. *See Id.* Only after such trial has concluded is the case appealable. *Id.*

"In many instances by the time an appellate court can determine that the taking was invalid, the condemning authority will have so changed the property that redress of the landowner is impossible. The *Devanssay* court concluded that in light of the nature of condemnation proceedings, "prohibition is a proper method to prevent such alleged injustice." *Id.* at 326.

"Prohibition is the proper relief for relators to seek in this instance. If the proceedings do not comply with the statute, then the trial judge is without jurisdiction to order the condemnation to proceed. An appeal after the taking of the property and any demolition by the PIEA and the development company would be a totally futile and ineffective remedy.

"The first issue within the scope of these writ proceedings is whether the ordinance approving the plan for the development was valid. The statute predicates the acquisition of real property upon the City Council's approval of the plan of the PIEA pursuant to § 100.400, RSMo. Under the specific direction of § 100.400.1(4):

A plan shall be sufficiently complete to indicate its relationship to definite local objectives as to appropriate land uses, improved traffic, foster employment, public transportation, public utilities, recreational and community facilities and other public improvements and the proposed land uses and building requirements in the project area, and shall include without being limited to:

(a) The boundaries of the project area, with a map showing the existing uses and condition of the real property therein;

(b) A land use plan showing proposed uses of the area;

(c) Information showing the standards of population densities, unemployment within area of adjacent areas, land coverage and building intensities in the area after completion of the plan;

(d) A statement of the proposed changes, if any, in zoning ordinances or maps, street layouts, street levels or grades, building codes and ordinances;

(e) A statement as to the kind and number of additional public facilities or utilities which will be required in the area after completion of the plan;

(f) A schedule indicating the estimated length of time needed for completion of each phase of the plan.

"The plan submitted by the PIEA mentions all the matters set forth in the foregoing subsections. The question to be determined is whether the plan's language sets forth enough factual material to permit a determination that the plan complies with the statute.

"In determining this question, the first and primary inquiry must be the intent and purpose of the legislature in drafting the statute to require that certain elements be included in the plan.

"Because the whole issue in this case turns on the question of the propriety of the condemnation action, it is appropriate to consider the grant of condemnation authority in the light of the statute. The power of the state to condemn, and particularly the delegation of that power to corporations public and private, is viewed jealously, and its exercise carefully limited. *See Maryland Plaza Redevelopment Corp. v. Greenberg,* 594 S.W.2d 284, 292 (Mo.App.1979); *State ex rel. Terrell v. Nicholls,* 719 S.W.2d 862, 866 (Mo.App.1986). In determining whether or not the power of condemnation exists under a given statute delegating the same to a public or private entity, the courts will examine the requirements of the statute with some care to determine that the condemnation power is appropriately delegated and exercised. *See Maryland Plaza Redevelopment Corp.,* 594 S.W.2d at 292; *State ex rel. Terrell,* 719 S.W.2d at 866. It is in the light of that overriding principle in eminent domain law that the particular statutory sections must be considered.

"The passage of an ordinance by the City Council is a legislative act. *Annbar Associates v. West Side Redevelopment Corp.,* 397 S.W.2d 635, 655 (Mo. banc 1965), *appeal dismissed,* 385 U.S. 5, 87 S.Ct. 41, 17 L.Ed.2d 4 (1966); *Parking Systems, Inc. v. Kansas City Downtown Redevelopment Corp.,* 518 S.W.2d 11, 15, 19 (Mo.1974). Such an act will ordinarily be deferred to by the courts but when the City Council has acted arbitrarily or as a result of fraud, collusion or bad faith, the City Council's decision need not be accepted by the court. *State on Inf. of Dalton v. Land Clearance for Redevelopment Authority,* 364 Mo. 974, 989, 270 S.W.2d 44, 52 (banc 1954); *Annbar Associates,* 397 S.W.2d at 655; *State ex rel. Atkinson v. Planned Industrial Expansion Authority,* 517 S.W.2d 36, 45 (Mo. banc 1975).

"No allegations of fraud or bad faith have been set forth here. The validity of the city ordinance in question turns on whether or not the ordinance was arbitrarily passed. If the City Council passed the ordinance approving the PIEA's redevelopment plan without any factual material in the plan or evidence before the Council to support a legislative determination of compliance with § 100.400, RSMo, then the ordinance is indeed arbitrary and void.

"Turning now to the question of the ordinance and plan in the instant case, it should be noted that the ordinance itself does not contain any specific findings with respect to the matters contained in § 100.400.1(4), (a) through (f), set forth above. All of the verbiage concerning these matters is contained in the plan itself and the ordinance simply adopts the plan. It is apparent from the statute that its general purpose and intent is to require a legislative oversight of the plan developed by the agency. The plan must be approved by the City Council and every substantial change must likewise receive approval. The statute clearly requires the legislative body to find that the plan complies with the statute before the legislative body may approve the plan. The whole purpose of the statute would be thwarted if there was not a legislative determination of the validity and sufficiency of the plan prior to the development of the project. The legislature has seen fit to require legislative approval prior

to acquisition of land or any other such implementation of a redevelopment plan.

"Looking at the subsections of § 100.400.1(4), (c) through (e), subsection (c) requires:

Information showing the standards of population densities, unemployment within an area and adjacent areas, land coverage and building intensities in the area after completion of the plan[.]

The plan "anticipates" that approximately 500,000 square feet of office space will be built in the project area. The only other language even remotely suggestive of the "information" required by subsection (c) is the following.

Any specific development proposal approved ... will contain among other things adequate provision for traffic, vehicular parking, safety from fire, adequate provision for light and air, sound desire and arrangement and improved employment opportunities. The plan is not expected to have any significant negative impact on adjacent traffic patterns or public transportation.

There is simply no factual material of any sort concerning standards of population densities, unemployment within the area and adjacent areas or land coverage after completion of the plan. The only exhibit that purports to demonstrate the area after the implementation of the plan, which was an attachment to the plan itself, is a sketch of the area showing the ground elevations and two proposed streets. There is not a shred of factual material nor evidence before the Council concerning the specific factual matters required by subsection (c).

"Subsection (d) reads as follows:

A statement of the proposed changes, if any, in zoning ordinances or maps, street layouts, street levels or grades, building codes and ordinances[.]

Again the plan itself contains absolutely no factual material concerning any proposed changes in zoning ordinances or maps, street layouts, street levels or grades, building codes or ordinances. Regarding streets and zoning, the following language is all that appears:

It is contemplated that major portions of Central and Wyandotte Streets and associated alleys will be vacated. Proposed new traffic corridors are shown on attached Exhibit 4 [proposed land use map]. Depending upon the nature of future development, it may be necessary to construct other streets or alter the location of the proposed traffic corridors.

. . . .

Given the proposed land uses of this plan, it is anticipated that the area will be rezoned to an appropriate planned commercial business district. Since it is not possible to anticipate the full extent of future development plans at this time, additional zoning changes may be necessary.

Again, this generalized language fails to provide any factual basis for a legislative determination.

"Under subsection (e), the statute requires:

A statement as to the kind and number of additional public facilities or utilities which will be required in the area after completion of the plan[.]

The plan recognizes that there may be relocation or abandonment of existing water lines as well as construction of new utilities. With respect to these matters, the plan specifically recites as follows: "The type and location of abandonment and/or relocation and/or construction of [water and sewer] lines, at this time, is impossible to determine." Thus, the plan itself simply denies that a statement as to the kind and number of additional public facilities or utilities which will be required can be made. Obviously a part of the legislative determination made when such a plan is approved is a determination of the consequence of such approval on the overall utility system and scheme of the city and, in particularly on the area in question. The only purpose for the statute to require such factual matters in the plan is to permit the members of the legislative body to make an intelligent, informed and appropriate legislative decision with respect to approval of the plan. Absent such a factual basis, the legislative determination can only be arbitrary and capricious and without any factual foundation. The plan simply does not provide any factual basis for a

determination by the City Council of the validity of the plan.

"The second issue, the question of modification of the plan without Council approval, is likewise based upon the failure of the plan as presented by the PIEA to provide any specific frame of reference from which to measure any change in the plan from that proposed and approved by the City Council. Section 100.400.1(10) provides, "[w]here the proposed modification will substantially change the plan as previously approved by the governing body." That language is likewise recited in the ordinance itself. Both the approved plan and the redevelopment proposal of the K-A company are in evidence in this case. The K-A development proposal was approved by the PIEA on December 8, 1982, but has been neither presented to nor approved by the City Council. Comparison of the salient features of the K-A development proposal and the PIEA plan approved by the September 28, 1982, ordinance reveals that the development proposal differs markedly from the PIEA plan. The PIEA plan only makes sketchy provision for access by new streets; the K-A plan substantially modifies existing streets and utilities and the proposals are quite different from those shown in the PIEA plan. The K-A proposal requires the development of a detailed utilities plan for new and upgraded utilities. There are detailed plans for structures for offices, retail shops, a hotel, and a major office building. None of this information is contained in the PIEA plan.

"The foregoing is not intended as a criticism of the plan submitted by the K-A Development Company. It is submitted simply to show that the K-A development proposal makes very substantial changes from the general and nonspecific language of the PIEA plan which factually would provide an entirely different basis for a legislative determination. The exhibits attached to the K-A plan show very substantial departures from the existing situation as well as from the PIEA plan. Very substantial variations in the streets, sewers, and utilities are shown by the K-A plan. This is demonstrated by reason of the site plans and building location plans attached to the K-A plan which when com-

pared with the original PIEA plan show that sewers and utilities would either be partially located under multi-story buildings or would require very substantial rerouting. There is simply no factual information as to the impact of these and other significant changes in the plan upon either the area itself, the City, or the adjacent areas. All of the foregoing leads inevitably to the conclusion that the K-A plan constitutes a substantial modification and departure from the PIEA plan. As such, it has not received the approval of the governing body, the City Council of Kansas City, Missouri, and the use of condemnation to implement the K-A plan will simply violate openly the requirement of the statute and the ordinance that such modifications in the plan receive legislative approval by the City Council of Kansas City, Missouri. For the foregoing reasons, the preliminary writ issued in this cause should be made absolute.

So ordered."

Cause No. 69528 should be retransferred to the Court of Appeals, Western District as improvidently transferred for entry of and publication of the Court of Appeals opinion or this Court should make the preliminary writ in prohibition absolute thus making Cause No. 69317 for declaratory judgment and damages for tortious interference with property moot.