

# IN THE MISSOURI COURT OF APPEALS
# WESTERN DISTRICT

| | | |
|---|---|---|
| **CITY OF KANSAS CITY, MISSOURI,** | ) | |
| | ) | |
| **Respondent,** | ) | **WD76861** |
| | ) | **(Consolidated with WD77187** |
| **v.** | ) | **and WD77917)** |
| | ) | |
| | ) | **OPINION FILED:** |
| **TELESTER AMEENA POWELL,** | ) | **October 7, 2014** |
| | ) | |
| **Appellant.** | ) | |

### Appeal from the Circuit Court of Jackson County, Missouri
### The Honorable Sandra C. Midkiff, Judge

**Before Division One:** Mark D. Pfeiffer, Presiding Judge, and
Karen King Mitchell and Gary D. Witt, Judges

This is an appeal from a condemnation action wherein the City of Kansas City sought to condemn the property of Telester Ameena Powell (among others) to facilitate its construction of the East Patrol Campus, a combination police station and crime lab. The trial court granted the City's condemnation petition, and following a trial on exceptions to the damages assessed by three appointed commissioners, a jury determined the fair market value of Powell's property to be $55,000. Powell raises numerous challenges to both the condemnation and damages determinations. We affirm.

## Factual Background

On October 5, 2011, the City sent Powell a letter by certified mail, alerting her that her property, located at 2611 Brooklyn Avenue in Kansas City, Missouri, was located in an area undergoing redevelopment by the City. The City advised Powell that it needed to acquire the following property rights for Project #07000168, East Patrol Campus:

> A fee interest in part of the Property legally described as: THE EAST 125 FEET OF LOT 19, BLOCK 3, THE SUMMIT, A SUBDIVISION IN KANSAS CITY, JACKSON COUNTY, MISSOURI

The letter identified the following rights that Powell could exercise, at her option:

1. You may seek legal counsel at your own expense.

2. You may obtain an independent appraisal of the property rights described above from a state licensed or state certified appraiser of your choice at your own expense. The City will have one done also. If and when you are contacted by the City's appraiser, you are encouraged to set an appointment for inspection of your property at the earliest convenient time to both parties.

3. You may make a counter-offer and/or engage in further negotiations. It is important that the City hear from you quickly if you wish to negotiate. Please call the Agent listed below immediately.

4. You have the right to seek assistance from the office of ombudsman for property rights created under section 523.277 of the revised statutes of Missouri.

5. The first hearing in the condemnation process determines if the City has the right to condemn. You have the right to contest that determination at that initial hearing.

6. You have the right to a second hearing, where three court-appointed condemnation commissioners preliminarily determine just compensation for your property. If either you or the City is not satisfied with the commissioners' determination, either party may appeal to a jury.

7. You have the right to request vacation of an easement under the procedures and circumstances under Section 3 quoted below:

> Section 3. "A property owner of land burdened by an easement created after December 31, 2006, abandoned in whole for a period in excess of ten

years, may petition a court of competent jurisdiction to obtain the rights previously transferred and vacation of the easement for monetary consideration equal to the original consideration obtained by the property owner in exchange for the easement. The holder of the easement shall be a party to such action. The holder of any such easement shall be allowed to maintain the easement upon a showing that the holder, in good faith, plans to make future use of the easement. The right to request that an easement be vacated may be waived by the property owner of record from whom the easement was originally acquired or by such property owner's successor in title to the burdened property either in the original instrument of conveyance or in a subsequent signed writing."[1]

8. You may request an alternate location for the City's proposed taking within 30 days of receiving this letter. Your alternate shall be on the same parcel of land and shall be clearly described. The City will consider your alternate.

The City then requested appraisals of Powell's property from three different appraisers for the purpose of making offers to Powell for her property. The appraisals were all conducted in November and December 2011, and they valued Powell's property at $23,000; $38,000; and $55,000. In January 2012, following the appraisals, the City sent Powell another certified letter, offering her $55,000 for her property and giving her 30 days in which to respond.[2] Powell did not accept the offer. The next month, the City sent Powell a second offer, which included, in addition to the original $55,000, a homestead value of $13,750, for a total offer of $68,750. Powell did not accept this offer. The next month, the City sent Powell its purported "final" offer, which included the previous property appraisal and homestead values, with an additional settlement value of $11,250, for a total offer of $80,000. Powell did not accept this offer either, but apparently suggested in an email that, if the City raised the offer by $10,000, she would accept it. The City agreed with Powell's terms and, in April 2012, sent her a "final total offer" of

---

[1] This language comes from § 527.188 of the Missouri Revised Statutes, as updated through the 2011 Cumulative Supplement. All further statutory references will be from the Missouri Revised Statutes, as updated through the 2011 Cumulative Supplement, unless otherwise noted.

[2] Unlike the original redevelopment notice, which indicated that only part of Powell's property was required, the certified offer letters all referred to the property sought to be acquired as: "Fee Simple estate legally described as: THE EAST 125 FEET OF LOT 19, BLOCK 3, THE SUMMIT, A SUBDIVISION IN KANSAS CITY, JACKSON COUNTY, MISSOURI" and included "Property Address: 2611 Brooklyn, Kansas City, MO."

$90,000. Despite her earlier indication, Powell again refused to accept the City's offer. Consequently, in May 2012, the City withdrew the $90,000 offer and reinstituted the $80,000 offer. Again, Powell did not accept the offer.

On June 28, 2012, the City passed Ordinance 120509, which authorized condemnation of various private properties in the area bounded by Brooklyn and Prospect Avenues and 26th and 27th Streets, in Kansas City, Missouri, for the purpose of constructing and maintaining the East Police Campus. Among the properties to be condemned was Powell's property at 2611 Brooklyn Avenue, described as "The east 125 feet of lot 19, block 3, The Summit, a subdivision in Kansas City, Jackson County, Missouri."

On July 23, 2012, the City filed a Petition in Condemnation, invoking the authority granted to it by § 82.240 and seeking to condemn various properties (including Powell's) to build a police station and crime lab for public use. The petition indicated that the City had complied with all of its legal obligations prior to filing the petition and then sought notice to be served upon the defendants, a court order finding the petition sufficient and the lands described therein to be condemned, appointment of three disinterested commissioners to assess damages to defendants, vesting of title to the property in the City following payment of the assessed damages, and any further orders as needed.

On September 9, 2012, a special process server attempted to serve Powell at 2718 Brooklyn Avenue with a summons for the condemnation hearing. The residence at 2718 Brooklyn belonged to Powell's mother, but at the time, the City believed Powell to reside there as well, based upon its perception that 2611 Brooklyn was in a state of rehabilitation and uninhabitable. A woman answered the door at 2718 Brooklyn and indicated that Powell was not there. The process server was later shown a picture of Powell and believed the woman he

4

encountered to have been Powell,[3] so he returned to 2718 Brooklyn and spoke with Powell's mother, who refused to accept service on Powell's behalf. The process server advised Powell's mother that he was leaving the papers with her, and he left them on the porch of the home. The City also published notice of the condemnation hearing in a local newspaper.

Powell sought to quash the service attempted at 2718 Brooklyn. The court granted Powell's motion, but determined nevertheless that Powell had been adequately served through publication.

On September 21, 2012, the court held a hearing on the condemnation petition. At the hearing, the City presented testimony from Pat Ferguson, Senior Acquisition Agent for the City of Kansas City. Ferguson testified that 127 parcels were sought to be acquired for the purpose of creating the East Patrol police station project, which would operate to serve the public. Ferguson testified to the three appraisals made of Powell's property, along with the various offers the City provided to Powell in its effort to purchase her property.

Instead of cross-examining Ferguson, Powell sought a continuance, based upon her recent receipt of the petition, to more adequately prepare to meet the allegations in the condemnation petition. The court granted Powell's request and reset the remainder of the hearing as to her property for October 1, 2012.

At the hearing, Powell requested an additional continuance to conduct discovery, but that request was denied. Powell then argued that the East Patrol Campus project was for private use, rather than public use, and that it was meant to further political interests of a nearby local church. Powell presented a letter from a nearby neighborhood association indicating that they were not advised of the project until September 2011 at the earliest and that they were neither invited to

---

[3] Powell has a twin sister who lives with their mother, and Powell claimed that it was her twin that answered the door.

5

nor advised of any planning meetings or discussions of potential location. Powell also presented a comparison of her block and other nearby blocks, demonstrating that there were other areas with more vacant property that could be used. Powell presented no further evidence. Despite her allegations of private use, Powell acknowledged that building a police station and efforts to ensure public safety were public uses.

On October 2, 2012, the court issued its order, finding that all interested parties had received adequate notice, that the intended taking was for public use, that the City was authorized to condemn the property at issue, and that the City had engaged in good faith negotiations with each of the owners to reach just compensation for the property. Therefore, the court ordered the property to be condemned and authorized the City to take possession immediately upon the filing of the Report of the Commissioners and payment to the Circuit Court Clerk of the amounts assessed in the report. The court further appointed the Honorable C. William Kramer, Ms. Judy Johnson, and Mr. Edward J. Newsome as commissioners to assess the fair market value of the property and gather facts related to any homestead or heritage value to be assessed.

Thereafter, the commissioners issued their report, finding the fair market value of Powell's property to be $65,000 and determining that she was entitled to a homestead value of $16,250, for total damages of $81,250. The court accepted the commissioners' report and ordered that they be paid $1,900 each by the City for their work. Both Powell and the City filed exceptions to the commissioners' report, and the court set the matter for a jury trial on February 26, 2013.[4] In the meantime, the City paid $81,250 to the circuit clerk for the damages assessed by the commissioners for Powell's property, and the court ordered title to the property

---

[4] The trial was subsequently continued to March 12, 2013, and then again to May 28, 2013, to allow Powell time in which to conduct discovery.

6

thereafter to be vested in the City. On February 28, 2013, the City sought a writ of possession for the property. After an evidentiary hearing, the court granted the City's writ request.

On May 9, 2013, Powell sought leave to file an answer to the condemnation petition out of time. The City opposed, and the motion was denied. On May 24, 2013, four days before the scheduled jury trial, Powell filed a motion for change of judge pursuant to Rule 51.05 and § 476.180. The motion alternatively argued entitlement to change of judge as a matter of right and change of judge for cause. Though the motion alleged that the trial judge was biased, the motion provided no reasons, apart from disagreements with prior rulings, to support an allegation of bias. The motion was overruled on the basis that it was both untimely and failed to allege any cause for recusal.

At the jury trial, Powell presented testimony from herself as both a fact and an expert witness. Powell testified that she was a real estate broker and that she marketed and managed foreclosed properties. She further testified to the historical value of her home (it was built in 1895) and surrounding neighborhood, as well as the value of the location and its proximity to various city attractions. Powell further testified to all of the repairs she had made and was planning to make to the home. Powell indicated her belief that the highest and best use of the property was—not as residential—but as "a parcel as part of a bigger development." Powell further offered a market analysis approach to valuation, wherein she identified and presented to the jury a variety of properties she deemed comparable to her own. The home values ranged from $66,500 to $225,000. Powell testified that her professional opinion of fair market value for her property was $140,000.

Powell also sought to offer testimony from Larry Goldblatt, an architect, to testify to the fair market value of her property. But because Goldblatt was not a certified appraiser, the court

7

found that he did not qualify to give his opinion on fair market value. The court noted, however, that he could potentially serve as a fact witness, due to his familiarity with the East Patrol Campus project. The court then asked Powell what fact-witness questions she might have for Goldblatt. But because Powell failed to identify any information relevant to the determination of fair market value, the court excluded Goldblatt as a witness.

The City again presented Ferguson as a witness, and he again testified to the valuation from each of the three appraisals conducted on Powell's property. Ferguson also testified that a fourth appraisal was conducted by Beverly Easterwood—the appraiser that had initially found the property's value to be $55,000—approximately one year before the taking. Her second appraisal, which was conducted as of the date of the taking, valued Powell's property at $61,000. Ferguson further testified that, of the various parcels of land needed for the project, approximately 50 were vacant, approximately 12 were boarded up, and 13 were owned by the Land Trust of Jackson County, meaning that they had not sold after an auction to collect back taxes.

The City also presented testimony from Easterwood regarding her second appraisal of Powell's property. Easterwood testified that her second appraisal was conducted based solely on her photographs from the first appraisal because Powell would not allow her back onto the property for the second inspection due to Powell's belief that recent vandalism caused the property to no longer reflect its true condition. Easterwood indicated that the increase in value was due to rising market values in the nearby comparable sales.

The jury returned a verdict finding the fair market value of Powell's property to be $55,000. The court thereafter ordered the circuit clerk to return $12,500 to the City as its overpayment of both fair market and homestead values. Powell appeals.

**Analysis**

Powell raises five claims on appeal.  In her first and fifth points, Powell claims that the trial court lacked subject matter jurisdiction because there was insufficient evidence demonstrating the City's compliance with the statutory and constitutional prerequisites for exercising the power of eminent domain.  In her second point, Powell argues that the trial court erroneously applied the law because the commissioners it appointed to assess damages were not disinterested in that the same three commissioners had been appointed in other condemnation cases tried before the same judge and for the same East Patrol Campus project.  In her third point, Powell argues that the trial court lacked subject matter jurisdiction over the exceptions trial because Powell timely filed an application for change of judge.  In her fourth point, Powell argues that the trial court abused its discretion in the following rulings:  (1) denying Powell the opportunity to conduct discovery for purposes of contesting the propriety of condemnation; (2) failing to set a hearing on Powell's affirmative defense pursuant to section 523.261; (3) denying Goldblatt's testimony at the exceptions trial; and (4) denying Powell the opportunity to present evidence regarding the project influence doctrine.  Finding none of her claims to be meritorious, we affirm the trial court's judgment.

### A.  Procedure to Condemn Property

Initially, it is helpful to discuss the procedure required for a municipality to exercise the power of eminent domain.

"The power of eminent domain is the inherent power of a State to take private property." *City of Kansas City v. Hon*, 972 S.W.2d 407, 409 (Mo. App. W.D. 1998).  Our constitution limits this power by providing that "private property shall not be taken or damaged for public use without just compensation."  Mo. Const. art. I, § 26.  The constitution further provides that

"private property shall not be taken for private use with or without compensation, unless by consent of the owner."[5] Mo. Const. art. I, § 28. "Operating together, these constitutional provisions allow the State to exercise its inherent power of eminent domain so long as the purpose for which land to be taken is a public purpose and the State pays just compensation." *State ex rel. Jackson v. Dolan*, 398 S.W.3d 472, 476 (Mo. banc 2013).

Though "[t]he power of eminent domain does not inherently belong to municipalities, . . . the State may delegate this authority to cities or other public and private entities, subject to constitutional limitations." *Hon*, 972 S.W.2d at 409. In section 82.240, the State did just this:

> It shall be lawful for any such [constitutional charter] city to make provision in its charter, . . . to acquire and hold . . . by the exercise of the power of eminent domain by condemnation proceedings, lands for public use, . . . for . . . any . . . public purpose, and to provide for managing, controlling and policing the same.

"Condemnation under Missouri law contemplates a two-step procedure described and set forth in Chapter 523 . . . and Rule 86." *State ex rel. Mo. Highway and Transp. Comm'n v. Anderson*, 735 S.W.2d 350, 352 (Mo. banc 1987). "'First, the court must determine whether the condemnation is authorized by law—*i.e.*: . . . [H]as the condemning authority complied with the conditions precedent to bringing the action.'" *Id*. (quoting *State ex rel. Devanssay v. McGuire*, 622 S.W.2d 323, 325 (Mo. App. E.D. 1981)). Those conditions are: (1) that the condemnation is for a public purpose; (2) that condemnation is a matter of public necessity; and (3) that "the condemnor negotiated in good faith with the property owner regarding the amount of compensation before seeking condemnation." *Hon*, 972 S.W.2d at 409, n.2; *see also* Mo. Const. art. I, §§ 26, 28; § 523.256.

---

[5] The constitution also allows for taking of private property for the following purposes that are inapplicable here: private ways of necessity and drains and ditches across the lands of others for agricultural and sanitary purposes. Mo. Const. art. I, § 28.

Second, "'the court must establish the landowner's damages from the taking.'" *Anderson*, 735 S.W.2d at 352 (quoting *Devanssay*, 622 S.W.2d at 325). "'At that stage, commissioners are appointed to assess the landowner's damages and upon payment of the commissioners' award[,] the condemning authority acquires the property and may proceed to utilize it as prayed in its petition for condemnation.'" *Id.* (quoting *Devanssay*, 622 S.W.2d at 325). If either party disagrees with the commission's assessment, that party "'may request a jury trial to establish the landowner's damages[, commonly known as the exceptions trial,] and only after that trial has concluded is the case appealable.'" *Id.* (quoting *Devanssay*, 622 S.W.2d at 325).

## B. Subject Matter Jurisdiction

We first address Powell's first and fifth points on appeal, regarding whether the trial court was divested of subject matter jurisdiction as a result of the City's alleged failure to comply with the statutory and constitutional prerequisites to its exercise of eminent domain. "The question of whether a circuit court has jurisdiction over a case is purely a question of law that this court reviews *de novo*." *Payne v. Markeson*, 414 S.W.3d 530, 536 (Mo. App. W.D. 2013).

Though the condemnation prerequisites have been referred to in the past as "jurisdictional," *see Hon*, 972 S.W.2d at 409, these references occurred before the Missouri Supreme Court's clarifying decision in *J.C.W. ex rel. Webb v. Wyciskalla*, 275 S.W.3d 249 (Mo. banc 2009). In *Webb*, the Court pointed out that "Missouri courts recognize two kinds of jurisdiction: subject matter jurisdiction and personal jurisdiction." *Id.* at 252. "Subject matter jurisdiction . . . [is] the court's authority to render a judgment in a particular category of case." *Id.* at 253. "[T]he subject matter jurisdiction of Missouri's courts is governed directly by the state's constitution." *Id.* "Article V, section 14 sets forth the subject matter jurisdiction of

11

Missouri's circuit courts in plenary terms, providing that '[t]he circuit courts shall have original jurisdiction over *all* cases and matters, civil and criminal.'" *Id.*

"A condemnation action is a civil case over which a trial court has constitutionally vested subject matter jurisdiction." *St. Louis Cnty. v. Berck*, 322 S.W.3d 622, 627 (Mo. App. E.D. 2010). Thus, the trial court had subject matter jurisdiction over the City's condemnation petition. *See id.*

Powell argues that the court was divested of subject matter jurisdiction by virtue of the City's alleged failure to meet the prerequisites for maintaining a condemnation action. But "[a] circuit court's statutory authority to act differs from a circuit court's constitutionally granted subject matter and personal jurisdiction." *Id.* Although a condemnor's failure to prove the prerequisites "may preclude the trial court from allowing [the] acquisition of property by condemnation," any such failure "does not deprive the trial court of its constitutionally vested subject matter jurisdiction over the condemnation action." *Id.* Thus, Powell's true claim is that the trial court lacked authority to grant the City's condemnation petition. We disagree.

Good Faith Negotiations

Powell first argues that the City failed to engage in good faith negotiations with her for her property before filing its condemnation petition. Section 523.256 states that "[b]efore a court may enter an order of condemnation, the court shall find that the condemning authority engaged in good faith negotiations prior to filing the condemnation petition." The statute further states that "[a] condemning authority shall be deemed to have engaged in good faith negotiations if:

(1) It has properly and timely given all notices to owners required by this chapter;

(2) Its offer under section 523.253 was no lower than the amount reflected in an appraisal performed by a state-licensed or state-certified appraiser for the

condemning authority, provided an appraisal is given to the owner pursuant to subsection 2 of section 523.253[6] . . .

(3) The owner has been given an opportunity to obtain his or her own appraisal from a state-licensed or state-certified appraiser of his or her choice; and

(4) Where applicable, it has considered an alternate location suggested by the owner under section 523.265.

§ 523.256. "If the court does not find that good faith negotiations have occurred, the court shall dismiss the condemnation petition, without prejudice, and shall order the condemning authority to reimburse the owner for his or her actual reasonable attorneys' fees and costs incurred . . . ." *Id.*

1. *Notice*

Section 523.250 requires that "[a]t least sixty days before filing of a condemnation petition seeking to acquire an interest in real property, the condemning authority shall provide the owner of record of such property with a written notice concerning the intended acquisition." The notice shall include:

(1) Identification of the interest in real property to be acquired and a statement of the legal description or commonly known location of the property;

(2) The purpose or purposes for which the property is to be acquired;

(3) A statement that the property owner has the right to:

(a) Seek legal counsel at the owner's expense;

(b) Make a counteroffer and engage in further negotiations;

(c) Obtain such owner's own appraisal of just compensation;

---

[6] "[Section] 523.253.2 requires the condemning authority to provide the property owner with *either* 'an appraisal,' which must be 'made by a state-licensed or state-certified appraiser using generally accepted practices,' *or* 'an explanation with supporting financial data for its determination of the value of the property for purposes of the offer[,]' which is not subject to the same appraisal requirements." *Carroll Elec. Co-op. Corp. v. Lambert*, 403 S.W.3d 637, 648 (Mo. App. S.D. 2012).

13

(d) Have just compensation determined preliminarily by court-appointed condemnation commissioners and, ultimately, by a jury;

(e) Seek assistance from the office of the ombudsman for property rights created under section 523.277;

(f) Contest the right to condemn in the condemnation proceeding; and

(g) Exercise the rights to request vacation of an easement under the procedures and circumstances provided for in section 527.188.

*Id*. "The written notice required by this section shall be deposited in the United States mail, certified or registered, and with postage prepaid, addressed to the owner of record as listed in the office of the city or county assessor for the city or county in which the property is located." *Id*. at .2. "The receipt issued to the condemning authority by the United States Post Office for certified or registered mail shall constitute proof of compliance with this notice requirement . . . ." *Id*.

Here, the City demonstrated compliance with the notice requirements. The letter it sent to Powell, by certified mail on October 5, 2011, advised her of its intent to obtain an interest in her property, along with a legal description of that property. The notice further described the purpose for the intended acquisition, along with all of the rights Powell had available to her regarding the acquisition.

The letter, however, erroneously stated that the City intended to acquire only part of Powell's property. It also included a right that would have been available to Powell only if the City were truly seeking a partial taking, as stated in the letter.[7] The City's error obviously created much unnecessary confusion and frustration for Powell, who repeatedly sought to exercise a right that was, in fact, unavailable under the circumstances, given that the City was

---

[7] Section 523.265 allows a property owner to propose an alternative location, within thirty days of receiving notice, for the property to be condemned. This right, however, "shall not apply to takings of an entire parcel of land." § 523.265.

14

actually seeking acquisition of her entire property rather than just a part. Though we strongly encourage the City to take more care in proofreading the notices it sends to its citizens in the future,[8] we are unable to discern any prejudice to Powell from this error in light of the fact that she was ultimately advised of the City's intent to acquire her entire parcel by the various offer letters she received. *See* § 511.260(10) ("When a verdict shall have been rendered in any cause, the judgment thereon shall not be . . . reversed, impaired or in any way affected . . . [f]or any mistake . . . in any description of any property, when the correct . . . description shall have been once rightly alleged in any of the pleadings or proceedings."). And because the earliest of these letters was sent more than sixty days before the condemnation petition was filed, the notice requirement was ultimately complied with. Thus, the City met the notice requirement for good faith negotiations.[9]

## 2. *Condemnor Appraisal*

Section 523.253 provides that "[a] condemning authority shall present a written offer to all owners of record of the property." The statute further specifies that "[t]he offer must be made at least thirty days before filing a condemnation petition and shall be held open for the thirty-day period unless an agreement is reached sooner." *Id*.

---

[8] The City attributes its mistaken description to a typographical error. Though that may be true, there is a vast difference between taking an easement through an individual's property and taking the entire property, much like Mark Twain's observation that "[t]he difference between the *almost right* word and the *right* word is really a large matter—'tis the difference between the lightning-bug and the lightning." MARK TWAIN, THE ART OF AUTHORSHIP: LITERARY REMINISCENCES, METHODS OF WORK, AND ADVICE TO YOUNG BEGINNERS 87-88 (George Bainton ed., New York, D. Appleton & Co. 1891).

[9] Powell relies on the Eastern District's opinion in *State ex rel. State Highway Commission v. Spell*, 665 S.W.2d 650, 652 (Mo. App. E.D. 1984), to support her argument that the petition should have been dismissed due to the City's proofreading error in the initial notice letter. *Spell*, however, is inapposite insofar as the error in that case involved an inaccurate description of the property to be taken, as contained in the petition itself, and the only accurate description was found in a document that was neither a pleading nor part of the proceedings. *Id*. Here, the petition and every other document provided to Powell, apart from the initial notice letter, accurately reflected the City's intent to acquire her entire parcel. Furthermore, the description of the property to be taken was consistently described in all communications and pleadings as "THE EAST 125 FEET OF LOT 19, BLOCK 3, THE SUMMIT, A SUBDIVISION IN KANSAS CITY, JACKSON COUNTY, MISSOURI."

Here, the evidence showed that the City obtained three separate appraisals of Powell's property, all by state-licensed appraisers, and then offered Powell the highest amount of the three appraisals. The City offered, in addition to the highest appraisal value, a homestead value and a settlement value.[10] In total, the City made four different offers, the highest of which was $90,000.[11] Thus, the City wholly complied with the offer and state-licensed appraisal requirements of sections 523.253 and .256(2).[12]

### 3. Condemnee Appraisal

In the initial letter sent to Powell, advising her of the City's intent to acquire her property, Powell was also advised of her right to seek her own independent appraisal of the property. She chose not to do so. Instead, she relied on her own expertise and used a market analysis approach to determine the value of her property. But because she was notified of her right to seek her own appraisal, the City complied with this requirement of good faith negotiations.

---

[10] Powell claims that the City improperly negotiated with homestead damages. We disagree. Though homestead damages are judicially determined, they are set by statute at 25% of the property's fair market value. § 523.039. Here, the City's initial offer did not include homestead damages because the City, at the time, did not believe that Powell resided at the property, which meant that she was not entitled to homestead damages. *See* § 523.001(3). After learning that Powell did reside at the home, however, the City included homestead damages in every following offer. The City's change of position does not equate to an attempt by the City to negotiate homestead damages.

[11] Powell accuses the City of failing to both send the $90,000 offer to her and hold it open for thirty days. Although the $90,000 offer was the only one sent by email and not certified mail, and although it was apparently good only for 12 days, it appears that all of these terms were set by Powell herself. The City's final offer letter, revoking the $90,000 and reinstituting the $80,000 offer indicates that the $90,000 offer was conditioned upon Powell's performance of her promise to either accept or close by April 30. When neither event occurred, the City revoked the offer and reinstituted the $80,000 offer. In any event, Powell failed to raise this challenge below; thus, there is no record for us to review.

[12] Powell argues that the appraisers used by the City failed to follow USPAP ethical standards in conducting their appraisals. This claim, however, even if true, does not affect the validity of the City's condemnation petition. Each of the appraisers used by the City was licensed by the State. That is all the statute requires. And in any event, Powell *did* attack the appraisers' credibility and methodology at the exceptions trial, but the jury nonetheless found them credible. "The jury judges the weight of the evidence and credibility of the witnesses, and where reasonable minds can differ on the facts, this court does not disturb the jury's verdict." *Ross v. Prime Transport, Inc.*, 3 S.W.3d 867, 868 (Mo. App. S.D. 1999).

*4. Alternate Location*

Section 523.265 provides that "[w]ith regard to property interests acquired by condemnation . . . , within thirty days of receiving a written notice sent under section 523.250, the landowner may propose to the condemning authority in writing an alternative location for the property to be condemned." Upon receipt of this suggestion, "[t]he condemning authority shall consider all such alternative locations" and provide the landowner with a written statement indicating its consideration of all proposed alternatives "and briefly stating why they were rejected or accepted." *Id.* This section, however, "shall not apply to takings of an entire parcel of land." *Id.* Thus, it is inapplicable to Powell's circumstances and was, therefore, not required as a condition precedent to the court's granting of the condemnation petition.

In sum, because the record demonstrates that the City met all of the requirements for good faith negotiations,[13] Powell has failed to demonstrate that the court lacked authority to grant the City's condemnation petition.[14]

## Public Use and Necessity

Powell further contends that the City failed to prove that the condemnation of her property was necessary for a public purpose. As noted above, the Missouri Constitution limits the power of eminent domain to the taking of private property only for public use. Mo. Const. art. I, § 26. "Although the Missouri Constitution uses the term 'public use,' relevant statutes,

---

[13] Powell filed a motion in this court for attorneys fees, costs, and other expenses, pursuant to § 523.256, that was taken with the case. Section 523.256, however, provides for these awards only "[i]f the court does not find that good faith negotiations have occurred" and, accordingly, dismisses the condemnation action. Because we have determined that the City did, in fact, engage in good faith negotiations, Powell's motion for attorneys fees, costs, and other expenses is hereby denied.

[14] Powell also argues that the evidence was insufficient to demonstrate good faith negotiations because the City failed to properly serve her with the petition and summons. This claim, however, does not address the issue of good faith negotiations. The obligation of good faith negotiations is placed upon the condemning authority as a condition precedent to the filing of the condemnation petition. § 523.256. Thus, service of the petition or summons thereon are irrelevant to the question of whether the City engaged in good faith negotiations *before* filing the petition. In any event, a review of Powell's claim, ex gratia, reveals that she was properly served by publication. *See* § 88.020 (allowing service by publication "[i]f the . . . residence of any owners be unknown"; at the outset of the proceedings, the City was unsure of Powell's actual residence).

17

ordinances, and case law use the terms 'public use' and 'public purpose' interchangeably." *Hon*, 972 S.W.2d at 410 n.3.

"[W]hen an attempt is made to take private property for a use alleged to be public, the question whether the contemplated use be public shall be judicially determined without regard to any legislative declaration that the use is public." Mo. Const. art. I, § 28. "[W]hat constitutes a public purpose should be given a broad and flexible rather than a narrow definition." *Hon*, 972 S.W.2d at 413. "'In order to constitute public use, it is not necessary that the whole community or any large part of it should actually use or be benefited by a contemplated improvement. Benefit to any considerable number is sufficient.'" *Arata v. Monsanto Chemical Co.*, 351 S.W.2d 717, 721 (Mo. 1961) (quoting *Kansas City v. Liebi*, 252 S.W. 404, 408 (Mo. banc 1923)).

Powell's property was condemned for the purpose of constructing and maintaining a patrol station and crime lab. The building and maintenance of a police station is a public use, *State ex rel. Police Comm'rs of the City of St. Louis v. St. Louis Cnty. Court*, 34 Mo. 546 (1864)—a fact conceded by Powell at the condemnation hearing. Thus, the City established that the taking was for a public use.

"While a court does not defer to a legislative . . . determination of what constitutes a public purpose, a court must defer to a . . . legislative determination that the use of eminent domain is necessary to effectuate that public purpose *unless* the objecting landowner proves that the condemning party's claim of necessity constitutes fraud or bad faith." *Hon*, 972 S.W.2d at 415.

Here, the City passed Ordinance 120509, declaring that certain private properties "*must* be condemned for the construction and maintenance of a patrol station and crime lab known as

18

East Police Campus."[15] (Emphasis added.) Thus, we are faced with a legislative determination of necessity.

Powell contends that the taking was unnecessary because there were other properties that she deems more suitable.[16] She makes no allegation on appeal that the passage of Ordinance 120509 constituted fraud or bad faith.[17] Thus, she has failed to demonstrate the only exception that would remove our deference to this legislative determination. And because there is a clear legislative determination of necessity in Ordinance 120509, the City has met its burden of demonstrating that the taking was necessary.

In sum, the record shows that the City satisfied all of the necessary prerequisites to seeking condemnation. Thus, the court had the authority to grant the City's petition.

Points I and V are denied.

## C. Appointment of Commissioners

In her second point on appeal, Powell argues that the court misapplied the law insofar as it failed to appoint disinterested commissioners to determine Powell's damages. Powell suggests that, because the commissioners appointed in her case were also appointed in other condemnation actions before the same judge and in connection with the same project, they were not disinterested as is required by section 523.040. We disagree.

"[T]he decree or judgment of the trial court will be sustained by the appellate court unless there is no substantial evidence to support it, unless it is against the weight of the evidence,

---

[15] Powell complains that the court improperly took judicial notice of the ordinance. While it is true that the contents of municipal ordinances may not be judicially noticed, but must be proven like every other fact, *BT Residential, LLC v. Bd. of Zoning Adjustment of Kansas City, Mo.*, 392 S.W.3d 18, 23 (Mo. App. W.D. 2012), the City submitted the ordinance as an exhibit to the trial court and did not rely solely on judicial notice.

[16] In making this argument, Powell relies on the statutes regulating zoning that are found in chapter 89. Section 89.250, however, provides that "[t]his law shall not limit or abridge any power now or hereafter conferred by law on such cities to establish building lines or take any property or any interest therein by eminent domain." Thus, the zoning laws found in chapter 89 are inapplicable.

[17] Though many of her arguments below were rife with allegations of fraud and bad faith, she has apparently chosen not to pursue those claims on appeal.

19

unless it erroneously declares the law, or unless it erroneously applies the law." *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976).

Section 523.040 requires the court to "appoint three disinterested commissioners, who shall be residents of the county in which the real estate or a part thereof is situated, and . . . at least one of the commissioners shall be either a licensed real estate broker or a state-licensed or state-certified real estate appraiser" in order to assess the damages the owner(s) may sustain as a result of the taking. According to Black's Law Dictionary, "disinterested" means "[f]ree from bias, prejudice, or partiality; not having a pecuniary interest." BLACK'S LAW DICTIONARY 536 (9th ed. 2009).

Here, Powell suggests that the fact that the same three commissioners were appointed by the same judge in other condemnation cases commenced as part of the City's East Police Campus project rendered them interested. We disagree.

First, the commissioners filed an oath, following their appointment, verifying that none of them were "connected by blood, friendship, financial considerations, or in any other way with any of the parties to this cause, and that [they were all] wholly disinterested in the outcome of this proceeding." Second, the fact that the commissioners had other similar experiences in establishing property values does not indicate that they were biased either towards or against Powell. There is nothing in the record indicating that either party received some benefit or detriment that would not otherwise have been received had different commissioners been appointed. In other words, there is no indication that the commissioners' prior similar experiences in any way affected their valuation of Powell's property.

Powell suggests that the commissioners developed a pecuniary interest in the matter insofar as they were compensated for their time in each case for which they served. Even if this

statutorily required compensation[18] could be said to have given the commissioners an interest in being appointed, there is no indication that it affected their ultimate valuation of the property at issue. In other words, the amount of their compensation was wholly unrelated to their valuation of the property. Thus, we disagree with Powell that the commissioners had a pecuniary interest in the matter.

Powell further argues that the use of the same commissioners in multiple condemnation cases pursuant to the same City project constituted illegal price fixing insofar as the valuations the commissioners rendered were designed to limit or fix the damages the City would have to pay out. There is simply no evidence in the record to support this allegation. Furthermore, it is worth noting that the commissioners' award was actually $10,000 higher than the value assessed in the highest appraisal, and the City filed exception to the commissioners' report, arguing that the value was too high. Both of these facts suggest a contrary conclusion to that posed by Powell.

In sum, there is no evidence in the record suggesting that any of the commissioners were interested. Furthermore, even if the commissioners had been interested, as suggested by Powell, we fail to see how this prejudiced her. We cannot say that the trial court misapplied the law.[19]

Point II is denied.

## D. Change of Judge

In her third point on appeal, Powell argues that the trial court lacked jurisdiction over the exceptions trial because Powell filed a timely motion for change of judge. A brief timeline is

---

[18] "The court shall allow the commissioners a reasonable compensation for their services, which shall be taxed as costs in the proceedings." § 523.070.

[19] Powell again complains in this point that the commissioners, rather than the court, determined homestead value. Again, homestead value is set by statute. § 523.039. And as part of its charge to the commission, the court required the commission to determine facts that would relate to the award of homestead damages. It is apparent that the commission believed Powell to reside at her property and, thus, be entitled to homestead damages in addition to the fair market value. There is no error in their identification of the amount, as it is set by statute and involves no discretion. This ultimately inured to Powell's benefit, as it increased her overall damage award.

21

helpful in evaluating Powell's claim. The City filed its condemnation petition on July 23, 2012. Powell was served by publication no later than August 30, 2012. The hearing on the petition was held on September 21 and October 1, 2012. The Commissioners' Report was issued on October 29, 2012. The exceptions trial was held on May 28-30, 2013. Powell filed her first motion for change of judge on May 24, 2013, four days before the start of the exceptions trial. Powell's motion for change of judge was filed, according to its own terms, pursuant to Rule 51.05 and section 476.180.

Rule 51.05(a) provides that "[a] change of judge shall be ordered in any civil action upon the timely filing of a written application therefor by a party." Rule 51.05(b) requires the application to be filed "within 60 days from service of process or 30 days from the designation of the trial judge, whichever time is longer."

There are multiple flaws in Powell's argument. First, nothing in Rule 51.05 "shall . . . be construed to extend or limit the jurisdiction of the courts of Missouri." Rule 51.01. Thus, even assuming she was entitled to a change of judge, the failure of the trial court to grant her request did not result in a loss of jurisdiction.

The second flaw in Powell's argument is that she was not entitled to an automatic change of judge under Rule 51.05, as her request was untimely. She was served at the latest on August 30, 2012 (at which time the trial judge was already designated). Her motion—filed on May 24, 2013—was well beyond the sixty-day window provided by Rule 51.05(b). Thus, it was untimely and properly denied.

Powell's motion, however, also invoked the authority of section 476.180. That statute provides: "No judge of any court of record, who is interested in any suit or related to either party, or who shall have been of counsel in any suit or proceeding pending before him, shall,

without the express consent of the parties thereto, sit on the trial or determination thereof." Nothing in Powell's motion suggests that the trial judge had any interest in the outcome of the condemnation case, was related to either party, or had been counsel at any point in the condemnation action. Thus, Powell was not entitled to a change of judge pursuant to section 476.180.

In her motion, Powell also invoked the authority of Rule 2-3.1(C). That rule allows for a judge to engage in extrajudicial activities, but indicates that when doing so, "a judge shall not . . . participate in activities that would demean the judicial office or cast reasonable doubt on the judge's capacity to act impartially as a judge." *Id*. Powell's motion, however, does not identify any extrajudicial activities of the judge, much less any that would cast doubt on her ability to act impartially. Thus, Rule 2-3.1(C) did not require a change of judge.

Powell's motion further alleged that there was "good cause" for a change of judge. Rule 51.05(d) indicates that "no party shall be precluded from later requesting any change of judge for cause." Thus, to the extent that her motion was a request for change of judge for cause, it was not untimely.

"'A denial of a motion for change of judge is reviewed for an abuse of discretion.'" *In re K.L.W.*, 131 S.W.3d 400, 404 (Mo. App. W.D. 2004) (quoting *McPherson v. U.S. Physicians Mut. Risk Retention Group*, 99 S.W.3d 462, 486 (Mo. App. W.D. 2003)). "'An abuse of discretion is committed if the trial court's decision defies logic under the circumstances, is sufficiently arbitrary and unreasonable to shock the conscience of the court, and exhibits a dearth of careful consideration.'" *Id*. (quoting *Betts-Lucas v. Hartmann*, 87 S.W.3d 310, 328 (Mo. App. W.D. 2002)). "'Our review must be based on the objective facts of the record from the standard point of a reasonable and disinterested bystander, unacquainted with the personality, the integrity

and dedication of the judge.'" *Id*. (quoting *State ex rel. McCulloch v. Drumm*, 984 S.W.2d 555, 557 (Mo. App. E.D. 1999)).

In arguing good cause for a change of judge, Powell identified a series of rulings made by the trial court during the proceedings. "Rulings against a party[, however,] do not establish bias or prejudice on the part of a trial judge." *In re Marriage of Maupin*, 829 S.W.2d 125, 127 (Mo. App. S.D. 1992). Although Powell alleged that "[t]he court is biased," she failed to identify any sources of the alleged bias. In fact, she wholly failed to allege any grounds demonstrating cause for a change of judge. Thus, we cannot say that the trial court abused its discretion in overruling her motion.

Point III is denied.

## E. Accumulated Errors

In her fourth (and final) point, Powell argues that an accumulation of errors caused the court to have abused its discretion in entering judgment against her. Powell identifies four alleged errors contributing to her claim of cumulative error: (1) the denial of discovery to contest the propriety of condemnation; (2) the failure to set Powell's affirmative defense under section 523.261 for a hearing; (3) the denial of Goldblatt's testimony at the exceptions trial; and (4) the denial of Powell's evidence under the project influence doctrine.

Although "a new trial can be ordered due to cumulative error, even without deciding whether any single point would constitute grounds for reversal," *DeLaporte v. Robey Bldg. Supply, Inc.*, 812 S.W.2d 526, 536 (Mo. App. E.D. 1991), "'[a]ny number of non-errors cannot add up to an error.'" *Nelson v. Waxman*, 9 S.W.3d 601, 608 (Mo. banc 2000) (quoting *Shepherd v. State*, 529 S.W.2d 943, 948 (Mo. App. 1975)). Here, none of the alleged errors Powell

identifies actually constitute error; thus, we will not evaluate whether they had a cumulative effect constituting error.

### 1. Discovery

Powell's first alleged error is that the trial court erred in denying her the opportunity to conduct discovery for the purpose of contesting the propriety of condemnation. At the initial hearing on the petition on September 21, 2012, Powell claimed that she had not received the petition before that day. Thus, the trial court gave her an additional ten days. During those ten days, Powell did not seek any discovery. Rather, she filed a motion to dismiss for insufficiency of service of process, an issue the court had already ruled on September 21, 2012.

Property owners are entitled to discovery on a condemnation petition only when they challenge, through a motion to dismiss, the condemning authority's claim of necessity as constituting fraud, bad faith or an arbitrary and unwarranted abuse of discretion. *See State ex rel. Rantz v. Sweeney*, 901 S.W.2d 289, 291 (Mo. App. S.D. 1995). The reason for this is because the condemnation procedure "does not contemplate extensive litigation at the first stage which is prior to the order of condemnation." *State ex rel. Mo. Highway and Transp. Comm'n v. Bush*, 911 S.W.2d 690, 691 (Mo. App. E.D. 1995). "Such a procedure prevents a single objecting landowner from delaying the commencement of the project for months or years by interrogatories, depositions, discovery[,] or dilatory practices." *Id.*

Here, Powell's motion to dismiss raised no allegations of fraud, bad faith, or an arbitrary and unwarranted abuse of discretion. Thus, she was not entitled to discovery.

### 2. Affirmative Defense

Powell's second claim of error is that the trial court failed to hold a hearing on her affirmative defense pursuant to section 523.261.

The first problem with Powell's allegation is that she did not file an answer in the case.[20] Though no responsive pleading is required in a condemnation action, one can raise affirmative defenses only through an answer. *See* Rule 55.27(a) ("Every defense . . . to a claim in any pleading . . . shall be asserted in the responsive pleading thereto."). Thus, though not required to file an answer, generally, if Powell wished to raise an affirmative defense, she could do so only by filing an answer. *See Caruthersville Sch. Dist. No. 18 of Pemiscot Cnty. v. Latshaw*, 233 S.W.2d 6, 11-12 (Mo. 1950) ("Pleadings are not required on the part of a defendant in . . . a [condemnation] proceeding to entitle him to recover full damages for the appropriation of his land but they are appropriate and necessary to raise other issues." (internal citation omitted)).

In any event, section 523.261 was inapplicable to Powell's case insofar as that section addresses condemnation for "blighted, substandard or insanitary areas." *See* § 523.261; Mo. Const. art. VI, § 21. The condemnation at issue here was for public use, not to correct blight. Thus, the court committed no error in not holding a hearing on an improperly asserted and inapplicable affirmative defense.

### 3. Goldblatt's Testimony

Powell's third claim of error is that the court erred in disallowing Goldblatt's testimony. The court excluded Goldblatt because he was not qualified to offer an expert opinion on fair market value, and he had no relevant factual evidence to provide. Powell provides us with no reasons why the court's ruling was erroneous, apart from the bare assertion that it was. We see no error in the court's ruling.

---

[20] We recognize that Powell sought leave to file an answer out of time, but her request was not filed until May 9, 2013, which was long after the condemnation hearing had been held and the petition ruled upon. Thus, the trial court did not abuse its discretion in denying her request.

*4. Project Influence Doctrine*

Powell's final claim of error is that the court erred in excluding evidence under the project influence doctrine.

"[U]nder the 'project influence' doctrine, juries are prohibited from 'consider[ing] either enhancements or depreciation brought about by the construction of [an] improvement for which the property is being taken. In other words, the value should be determined independent of [any] proposed improvement.'" *St. Louis Cnty. v. River Bend Estates Homeowners' Ass'n*, 408 S.W.3d 116, 130 (Mo. banc 2013) (quoting *St. Louis Elec. Terminal Ry. Co. v. MacAdaras*, 166 S.W. 307, 310 (Mo. 1914)). "Under this doctrine, Missouri courts may exclude evidence of sales that are influenced by the project for which a property is being acquired." *Id.*

"The dual purpose of this rule is first to safeguard the government from paying a premium price for land that would not have been valued so high but for the planned government project's enhancement of land value in the area." *State ex rel. Mo. Highways and Transp. Comm'n v. 1811 N. Broadway, LLC*, 405 S.W.3d 539, 545 (Mo. App. E.D. 2013). "Second, even more crucial to individual property rights, the rule exists to protect citizens who own private property from being penalized by receiving depreciated compensation for their land that would not have been so low but for the fact that the project will cause land prices in the area to fall." *Id.* at 545-46.

Powell seeks to invoke an alleged exception to the rule where "the project as originally contemplated did not include the property subsequently condemned." There are multiple flaws in Powell's claim. First, she has wholly failed to identify what evidence she sought to admit that was excluded by the court and how her claim was preserved. "To pursue a claim of evidentiary error on appeal, a party must do four things, two at the trial court and two on appeal." *Lozano v.*

*BNSF Ry. Co.*, 421 S.W.3d 448, 453 n.4 (Mo. banc 2014). "First, the party must raise the claimed error in a timely fashion, which means (when the claim is that the trial court improperly excluded evidence) that the proponent must offer the evidence at trial and make a detailed offer of proof concerning that evidence when the trial court orders that it be excluded." *Id*. "Second, the party must preserve that claim by including it in its motion for a new trial." *Id*. "Third, the party must present this claim in a proper point relied on in the appellate brief." *Id*. And "[f]inally, the party must provide a sufficient argument on that point in the party's brief." *Id.* Here, it is not clear to us that Powell accomplished any of these necessary prerequisites for us to review her claim on appeal.

Furthermore, even if the exception Powell suggests is valid, it is clearly inapplicable to her case, as her property has always been contemplated as one to be condemned for purposes of the project, and she has not demonstrated otherwise. Thus, we cannot say that the trial court erred in excluding evidence under the project influence doctrine.

In sum, because none of the alleged errors in Powell's fourth point constitute error, they cannot have a cumulative erroneous effect on the judgment.

Point IV is denied.

### Conclusion

The trial court committed no error. Its judgment is affirmed.

_____
Karen King Mitchell, Judge

Mark D. Pfeiffer, Presiding Judge,
and Gary D. Witt, Judge, concur.